# Richmond.

## GRACE v. VIRGINIA TRUST COMPANY, ADMINISTRATOR, ETC.

### March 22, 1928.

1. GIFTS—*Intention of Donor and Donee.*—The first element of a gift, whether *inter vivos* or *causa mortis*, is an intention on the part of the donor to give, and of the donee to accept, the thing given. The donor must intend to part with the title and ownership of the thing given and to confer it upon the donee, else there is no gift.

2. GIFTS—*Death of Donor—Uncorroborated Testimony of Donee.*—If the donor is dead at the time the gift is asserted, the fact of the gift cannot be established by the uncorroborated testimony of the donee. Code of 1919, section 6209.

3. GIFTS—*Motive—Motive will not Establish a Gift though it may Strengthen Evidence of a Gift.*—Mere motive, however strong, will not establish a gift. While it may support and strengthen evidence of a gift, it is not *per se* such evidence.

4. GIFTS—*Evidence to Establish—Dependent upon the Facts and Circumstances of the Particular Case.*—Whether or not a gift has been made is dependent upon the facts and circumstances of the particular case.

5. GIFTS—*Relationship—Presumption of Gift from Relationship of the Parties, or Existence of Motive.*—A gift will not be presumed merely from the relationship of the parties, or the existence of motives for making it.

6. GIFTS—*Burden of Proof to Establish.*—In every instance the burden is upon the alleged donee to establish the gift.

7. GIFTS—*Parol Gift—Gift not Asserted until after the Death of Donor—Gift must be Clearly Proved.*—Where no gift is asserted by the donee, no actual possession taken by him, nor any steps taken to obtain such possession, until after the death of the donor, a great opportunity for fraud on the donor is afforded, and an alleged gift should not be upheld unless it is clearly and plainly established.

8. GIFTS—*Evidence to Establish Gift—Possession Consistent with a Possession for the Purpose of Safekeeping—Doubt as to Whether Gift was Made.*—If, upon the whole case, the custody or possession of the donee is just as consistent with a possession for the purpose of safekeeping, or other like purpose, as with a gift, or if the judicial mind is left in doubt and uncertainty on the subject, then the gift must fail for want of necessary proof on the part of the donee.

9. GIFTS—*Evidence—Motive—Case at Bar.*—The instant case was a suit to establish a parol gift *inter vivos.* The evidence was satisfactory that the alleged donee and donor were engaged to be married. Hence, there was a motive for a gift, but this is not sufficient to establish a gift. Motive or no motive, there must be independent evidence of a gift.

10. GIFTS—*Evidence to Establish Gift—Refusal of Donee to Give Address of At-torney who Might have Corroborated a Statement of Hers—Case at Bar.*—The instant case was a suit to establish a parol gift *inter vivos.* Donor and donee were engaged to be married and the donee testified that the marriage was deferred for the reason that the donor was engaged in some litigation in Washington; but it was significant that while she knew the name of the Washington attorney of donor she re-fused to give it.

11. GIFTS—*Parol Gift by Decedent—Corroboration of Donee—Possession of Key to Safe Deposit Box—Case at Bar.*—The instant case was a suit to set up a parol gift *inter vivos* of certain liberty bonds. Complainant and decedent were engaged to be married. It was necessary under section 6209 of the Code of 1919 that the donee's statement that the donor had made the gift should be corroborated. The strongest evidence offered on the subject was the possession of the key by donee to the safe deposit box which contained the liberty bonds. It appeared in evidence that donor had deposited his surplus earn-ings with a merchant for safekeeping and took no receipt or other evidence of indebtedness from him, because he had confidence in him; also that he deposited with his landlady a bond for upwards of $5,000.00 for safekeeping, without taking a receipt for the same. Decedent knew that he had another key at the bank and had been warned by the bank not to keep both keys in the same place.

    *Held:* That the possession of the key by donee was in no way incon-sistent with possession for safekeeping.

12. GIFTS—*Parol Gift by Decedent— Corroboration of Donee—Corroborative Evidence Incredible in Itself and Contradicted—Case at Bar.*—The in-stant case was a suit to set up a parol gift *inter vivos* of certain liberty bonds deposited in a safe deposit box in a bank. Complainant and donor were engaged to be married. As donor was since deceased it was necessary under section 6209 of the Code of 1919 that the donee's statement that the donor had made a gift of the bonds to her should be corroborated. Complainant relied for corroboration on the testi-mony of a young negro man, purporting to give a conversation had with the alleged donor about ten minutes before his death. This testimony was, on its face, too improbable to be credible, and was flatly contradicted by a reliable white man standing by the donor when he was killed, and who had been talking to him continuously for a half an hour before his death.

*Held:* That the testimony was insufficient to corroborate complainant.

.13.  GIFTS—*Parol Gift by Decedent—Corroboration of Donee—Evidence Held not Corroborative.*—The instant case was a suit to set up a parol gift *inter vivos* of certain liberty bonds deposited in a safe deposit box in a bank. Complainant and donor were engaged to be married. It' was necessary under section 6209 of the Code of 1919 that the donee's statement that the donor had made a gift of the bonds to her should be corroborated. The donee's mother testified that the donor told her that he wanted to marry complainant if she would marry him, and if he died or anything happened to him he wanted her to have $20,000.00, and further that if she married him she would have $45,000.00.

*Held:* That there was nothing in this testimony to corroborate the testimony of complainant as to the gift alleged by her.   .

.14.  GIFTS—*Parol Gift to Decedent—Corroboration of Donee—Testimony of a Brother of the Donee as to Declarations of Donor which were Incapable of being Investigated or Contradicted—Case at Bar.*—The instant case was a suit to set up a parol gift *inter vivos* of certain liberty bonds deposited in a safe deposit box in a bank. Complainant and donor were engaged to be married. It was necessary under section 6209 of the Code of 1919 that the donee's statement that the donor had made a gift of the bonds to her should be corroborated. A brother of donee testified as to alleged conversations with the donor shortly before his death, in which donor declared that he had given donee bonds and keys and receipt for the safe deposit box in the bank. It was impossible for defendant to deny these conversations as no one else was present and the donor was dead. The testimony contained nothing but the alleged declarations of the donor, and these could be easily made coextensive with the claim of complainant and without fear of contradiction. The witness testified to no fact capable of being investigated or contradicted, and his testimony was inconsistent with that of the officials of the bank, from which the safe deposit box was rented.

*Held:* That if such testimony could be considered corroborative, it was very weak and subject to the closest scrutiny. .

.15.  GIFTS—*Parol Gift—Corroboration of Donee—Evidence Held not Sufficient to Corroborate Donee's Statement that the Deceased Donor had Given Her the Property—Case at Bar.*—The instant case was a suit to set up a parol gift *inter vivos* to complainant from a decedent. Decedent was engaged to the alleged donee. Decedent took a safe deposit box in a bank and deposited therein certain liberty bonds. Complainant testified that he told her that he had taken the box, and said that the liberty bonds in the box were hers, and gave her the key. Complainant said that she told decedent that she would leave the bonds in the box. One week after the death of decedent she

went to the box and found it empty.   During an interval of over two months, between the time of the alleged gift and the death of the decedent, complainant never mentioned the fact of the gift to any-one, nor did any of the letters of the alleged donor to her make any reference to the gift, and she took no steps to obtain possession of the bonds or to exercise dominion over them until the death of donor. Decedent left an only son.   The officers of the bank testified that when decedent took the box he told them that in case of his death the contents of the box were to be delivered to his son, and a note to that effect was made and placed in the box.   Decedent left one key to the box with the bank.   Complainant claimed that the son and father had been alienated on account of the marriage of the son, but the evidence did not support this claim.   Shortly before his death and after the time of the alleged gift, decedent and his son visited the bank and decedent showed his son the safe deposit box, intro-duced him to an official and told him that he wanted him to look at the son so that he would recognize him anywhere.   Upon the death of decedent the son went to the bank, which delivered to him the liberty bonds.   There was evidence of complainant's mother, her brother and another tending to corroborate her claim that the gift had been made.   But this evidence was of statements made by the donor to the witnesses; those to the mother did not corroborate her; those to the brother were not capable of being investigated or con-tradicted, and the third witness was contradicted.

*Held:*   That complainant was not sufficiently corroborated.

Appeal from a decree of the Hustings Court, Part II, of the city of Richmond.   Decree for defendant. Complainant appeals.

*Affirmed.*

The opinion states the case.

*Warren L. Tiller,* and *Wendenburg & Haddon,* for the appellant.

*A. B. Dickinson* and *Jno. S. Eggleston,* for the appellee.

BURKS, J., delivered the opinion of the court.

This suit was brought by the appellant, Mazie V. Grace, against the administrators of Robert J. Bond, to

set up a parol gift *inter vivos* from Bond to her of certain choses in action.

Bond was a widower about sixty-three years old, his wife having died in 1894, and Mrs. Grace, who had been divorced from her husband and had two children, was about twenty-five years old at the time of the alleged gift. When Mrs. Bond died she left surviving a son about two weeks old. The father provided for the rearing and support of his son and there seemed to exist normal relations of affection between father and the son as the latter grew to manhood. About five years after the death of his wife, Bond quit farming and obtained employment with a railroad construction company. From time to time as he accumulated any money he deposited it with a merchant friend in Weldon N. C., where he resided. These deposits continued from time to time until they amounted to from $1,000 to $1,500. He took no receipt or other evidence of debt for any of these deposits. Sometimes Bond would be gone a year or more at a time without making enquiry about his money. The money thus deposited, however, was properly accounted for, and is not in controversy in any way in this litigation.

After working for some years in North Carolina he went with the construction company to Flint, Michigan, where he spent a year or more. From there he went to Buffalo, New York, and from there to Richmond, Virginia, in the fall of 1920. He was killed suddenly in an accident February 4, 1924. For the last eighteen months of his life he boarded with a Mrs. Dillon. He had confidence in her integrity, and while boarding with her asked her to take care of and preserve for him a bond, or bonds, amounting to upwards of $5,000.00. She said to him that she had no safe place to keep it, but he replied that it was all right, to lock it up in a

drawer or something of the kind, and he would call for it when he wanted it. He took no receipt for it. He did not call for it in his lifetime, and on the day of his death his son came to Richmond to see about his interment, and while there Mrs. Dillon surrendered this bond to him. This bond, however, is not in controversy in this suit.

At the time of his death Bond had an estate of upwards of $36,000.00, consisting of $14,200.00 of negotiable Liberty bonds, the bond which had been deposited with Mrs. Dillon of upwards of $5,000.00, and nearly $17,000.00 deposited in three different banks.

Bond had left with the Savings Bank of Richmond certain Liberty bonds, owned by him, for safekeeping, but at the time he left them the bank did not have any safety boxes for customers, but kept securities of its customers in a private safety box along with its own valuables. In 1923, the bank built a new banking house in which it placed a number of safety boxes for the use of its customers. Each customer who rented a box was provided with two keys and was advised to keep them in separate places so if one got lost the owner could still have another. These keys, however, would not unlock the box until the lock had been first turned by a master key, which the bank kept. Neither the bank alone nor the renter of the box could get into the box without the use of the other's key. On November 7, 1925, Bond rented one of these boxes and paid the rent for a year. The bank tendered him two keys but he refused to take but one of them, saying he wanted the bank to keep the other so it could get into the box and clip the coupons on the bonds and put them to his credit as they matured. He, therefore, left one of the keys with the bank. At some time, the date is not satisfactorily fixed by the testimony, Bond

instructed the vice-president of the bank, in the event of his death, to notify his son, Ellis G. Bond, Weldon, North Carolina, and to deliver to him the contents of the box. The vice-president made a memorandum to this effect and when the box was rented put the memorandum in the box with the Liberty bonds above mentioned. On February 8, 1924, just four days after the death of R. H. Bond, the lock box was opened by one of the officers of the bank and the Liberty bonds were taken out and delivered to Ellis G. Bond. The receipt for these bonds, amongst other things, contains this language: "The above named Liberty bonds were left with this bank by R. J. Bond with the request that upon his death they be delivered to his son, Ellis G. Bond."

Mrs. Grace claims that she first became acquainted with R. J. Bond in the spring of 1921; that shortly thereafter he began visiting her and these visits became more frequent as time went on, and that she became engaged to be married to him in May, 1923. She had obtained a divorce *a mensa* from her husband in 1919, and an absolute divorce in April, 1923. The evidence shows that R. J. Bond had become madly infatuated with her by the summer of 1923. She testified on the subject of the gift as follows: "He told me during the summer of 1923 that he was going to give me some Liberty bonds, then later, about the last week in November I think it was on a Tuesday night, I am not sure, but it was the first part of the week—he was supposed to come on Tuesdays and Thursdays, he came nearly every Tuesday and Thursday, sometimes he would see me between them, but they were his regular nights—he said: 'May, I have paid rent on the box at the bank in advance and here is the receipt,' and he handed me the receipt across

the table; then he said:  'May, the Liberty bonds in the box are yours, here is the key.'  I was so overjoyed, I thanked him and kissed him on the side of his face. I took the key and looked at it and I told him that I did not understand much about boxes, vaults, keys and things and that I would just let the contents remain in the box as I had no use for them at that time and in case I wanted to use them I would ask his advice concerning them.' "

"27Q. When he said the Liberty bonds were yours, state whether or not he made any remarks about your right to go and get them if you wanted them?

"A. Yes, sir; he told me:  'Well, May, you know you can go down there right tonight if you wanted them for the contents of that box are yours.' "

Just one week after the death of R. J. Bond she went with her attorney to the bank and by the use of the key which Bond had given her, they opened the box and found that it was empty.  The officers of the bank told her that the bonds had been delivered to Ellis G. Bond according to the directions of his father hereinbefore referred to.  She demanded that the bonds should be returned to the bank and the bank should deliver them to her.  The bonds were thereafter returned to the bank by Ellis G. Bond but they were never given to Mrs. Grace, and that led to the present litigation.  She first brought an action of detinue to recover the bonds and other choses in action contained in the box.  This action was dismissed and she then brought the present suit.  In her bill she claims that the box contained not only the Liberty bonds aforesaid, but other evidences of debt, and that they all belonged to her, and she asked to have a disclosure of what other choses in action were in the box, and that it should be turned over to her.  She sought to

prove by other witnesses that there were other choses in action in the box but failed to do so. She did not testify until after these witnesses had testified that there were no other choses in action in the box, and she does not in her testimony claim anything except the Liberty bonds.

She also charges in her bill that R. J. Bond had become alienated from his son by reason of the son's marriage in 1919 to a lady that he did not approve. There is very slight evidence on her behalf on this question, and the evidence is clear, full and satisfactory that such was not the fact. He visited his son and daughter-in-law in February, 1920, and their relations were of the most friendly kind. After he went back to Flint, Michigan, he wrote letters from Flint, Michigan, Buffalo, New York, and Washington, District of Columbia, running through the months of May, July, August and September, to his son. The envelopes containing these letters were addressed to his son, but the letters themselves are each addressed, "My dear Son and Daughter." They are of an affectionate nature and it clearly appears from these letters and from other evidence in the case that there had been no alienation of the father's affections.

The son knew nothing of the relations existing between R. J. Bond and Mrs. Grace—in fact, never heard of Mrs. Grace until after the death of his father. The son also testified that during the Christmas holidays of 1923 his father went with him to the bank and showed him the safety box. He testified that his father said, amongst other things: " 'Son, you will be surprised and would hardly believe how much I have saved up. I want you to come and go with me to the Savings Bank.' We went to the bank and he asked for Mr. Ball. Mr. Ball was not in but he saw Mr.

Word.  My father told him he wanted him to look at me so that he would recognize me anywhere that he saw me.  He called attention to a scar I had here on my face.  Mr. Word said he would know me anywhere in the world he saw me.  *  *  *  Mr. Word took my father and me to the vault where the lock boxes were, and pointed out to me my father's box.  My father told Mr. Word to look at me so he would know me, and then he said:  'If anything should ever happen to me I want you to come to Richmond and the bank here will turn over to you what I have got here for you.' ''  This took place December 27, 1923.  On the next day and two succeeding days he wrote the most gushing letters of affection to Mrs. Grace, the authenticity of which is not called in question.

The record leaves no question about the fact that Bond and Mrs. Grace were engaged to be married. Mrs. Grace testified that the marriage was to take place in the spring of 1924 and that it had been postponed until that time because Bond had been involved in some pecuniary liability by a friend in Washington, which would not be barred until that time; that Bond made several trips to Washington to see about this business and especially to consult his attorney.  She testified that she knew the name of the attorney but she declined to give it and was unable to state more definitely what was the business trouble to which she referred.

Mrs. Grace was without means of support and had to work for a living.  In the summer of 1923, when she had become engaged to Bond, she communicated the fact to her father, mother, brother and sisters, and they gladly accepted the relationship.  The gift of the Liberty bonds is alleged to have been made in the latter part of November, 1923, and Bond was suddenly

killed in an accident February 4, 1924. During the interval of over two months she never mentioned the fact of the gift to anyone and took no steps to possess herself of the bonds or to exercise any dominion over them, nor is any reference made to the gift in any of the numerous letters which he wrote her in the meantime. Both parties were actively at work and either could readily have taken possession of the bonds in the interval mentioned.

[1-8] The first element of a gift, whether *inter vivos* or *causa mortis*, is an intention on the part of the donor to give, and of the donee to accept, the thing given. The donor must intend to part with the title and ownership of the thing given and to confer it upon the donee, else there is no gift. Moreover, if the donor is dead at the time the gift is asserted, the fact of the gift cannot be established by the uncorroborated testimony of the donee. Code, section 6209. Mere motive, however strong, will not establish a gift. While it may support and strengthen evidence of a gift, it is not *per se* such evidence. Whether or not a gift has been made is dependent upon the facts and circumstances of the particular case. A gift will not be presumed merely from the relationship of the parties, or the existence of motives for making it. In every instance, the burden is upon the donee to establish the gift. See 12 R. C. L., pages 932-3, section 10, and a full citation of authority in the notes. Where no gift is asserted by the donee, no actual possession taken by him, nor any steps taken to obtain such possession, until after the death of the donor, a great opportunity for fraud on the donor is afforded, and an alleged gift should not be upheld unless it is clearly and plainly established. If, upon the whole case, the custody or possession of the donee is just as consistent with a possession for the

purpose of safekeeping, or other like purpose, as with a gift, or if the judicial mind is left in doubt and uncertainty on the subject, then the gift must fail for want of necessary proof on the part of the donee.

[9] In the instant case, the evidence is satisfactory that the parties were engaged to be married. Hence, there was a motive for a gift, but, as we have seen, this was not sufficient to establish a gift. Motive or no motive, there must be independent evidence of a gift.

[10] Mrs. Grace testified that the marriage was deferred for the reason hereinbefore stated, and while she knew the name of Bond's Washington attorney she refused to give it. She does not claim that she ever disclosed to anyone the fact of the gift, nor is there any evidence that she did; nor do any of the letters of Bond to her make any reference to the gift.

[11] It was necessary under section 6209 of the Code that Mrs. Grace should be corroborated. This she undertook to do. The strongest evidence offered on the subject was the possession of the key to the safety box which contained the Liberty bonds. But that was in no way inconsistent with possession for safekeeping. Bond, for several years, deposited his surplus earnings with a merchant in North Carolina for safekeeping and took no receipt or other evidence of indebtedness from him, simply because he had confidence in him; and in 1922 or 1923 he deposited with Mrs. Dillon, with whom he boarded, a bond for upwards of $5,000.00 for safekeeping, and took no receipt for the same. The deposit of the safety box key with Mrs. Grace was in keeping with the other deposits mentioned. He knew that he had another key at the bank and had been warned by the bank not to keep both keys in the same place. As he had confidence in Mrs. Grace, it was not at all

unnatural for him to have left this key with her for safekeeping only. This version is also in keeping with the testimony of his son and the vice-president of the bank hereinbefore recited, relating to showing the son the safety box, and with the memorandum which the vice-president put in the box.

[12] Mrs. Grace also relied, for corroboration, on the testimony of a young negro man, purporting to give a conversation had with Bond about ten minutes before his death. This testimony is not recited because it is, on its face, too improbable to be credible, and was flatly contradicted by a reliable white man standing by Bond when he was killed, and who had been talking to him continuously for at least half an hour before his death.

[13] Reliance is also placed on the testimony of Mrs. L. O. Johnson, the mother of Mrs. Grace. Her whole testimony on the subject is as follows:

"6 Q. Do you remember a conversation at the table in the Christmas of 1923 when he made the remark that he loved your daughter better than anything in the world, and if so, what did your daughter do?

"A. Yes, sir; it was at the breakfast table Christmas morning. He said he loved her better than any girl in the world and he wanted to marry her if she would marry him, and if he died or anything happened to him he wanted her to have $20,000.00, and he said if she marries me she shall have $45,000.00. He said he thought more of her than anybody on earth. She left the table in tears. He said lots more in telling me how much he cared for her. Do you want me to word it?

"7 Q. Yes, go on.

"A. He said he was in sympathy with her as her husband had deserted her and he felt so sorry to know that she had to work and go through the cold."

We are unable to see that this testimony corroborates the testimony of Mrs. Grace as to the gift alleged by her.

[14] The only other testimony relied upon to corroborate the testimony of Mrs. Grace is that of her brother, R. J. Johnson. After stating that he was twenty-two years of age; that he learned of the engagement in the summer of 1923; that thereafter he became friendly with Bond and looked upon him as a brother, he testified as follows:

"11 Q. State whether you ever had a conversation with him in which he spoke to you about what he had done for your sister, the complainant, and if so, what he said?

"A. He said that my sister, May, did not think he loved her because she was young and he was an old man, but she had no right to think that because I have given her presents and given her my bonds and keys and receipt for the box in the vault in the bank.

"12 Q. When was this conversation?

"A. The first part of January, 1924.

"13 Q. State whether you ever had any conversation with him after that along the same lines, and, if so, what was the conversation?

"A. He told me my sister complained about his extravagance toward her; that she did not have any right to complain about that as I have given her enough to take car of her the rest of her life.

"14 Q. What extravagance did he refer to in that conversation?

"A. By expensive presents and taking her to the theater.

\*          \*          \*          \*          \*          \*

"17 Q. Now, after this conversation you have just spoken of, did you ever have a conversation with R. J.

Bond in regard to his son, and, if so, what was that conversation?

"A. He told me his son was well provided for and that only one person in this world could have his money and that is your sister.

"18 Q. What else did he say in reference to his son?

"A. He said his son had enough and if he could not live on what he had he would have to do without.

"Cross-examination.

"By Mr. Dickenson:

"1 Q. Mr. Johnson; you have related three conversations you had with Mr. Bond, you said the first of these conversations took place in the first part of January, 1924, will you please say when the second and third took place?

"A. The second took place several weeks after the first and the third before his death.

"2 Q. Can you tell us when that was?

"A. Before February 4, 1924.

"3 Q. You say the first took place the early part of January; that the second took place several weeks later; can you give us some idea when the third took place other than saying before his death?

"A. In the latter part of January.

"4 Q. Was anyone present at these conversations— at either of these conversations—other than yourself?

"A. No, sir.

"5 Q. Where were these several conversations held?

"A. At his home, 521 north Seventh street.

"6 Q. Do you remember the day of the week when any of these conversations took place?

"A. No, sir."

It was impossible for the appellees to deny these conversations, as "no one else was present," and Bond is dead. No statement attributed to Bond could be

successfully denied, If such testimony can be considered corroborated, it is very weak and subject to the closest scrutiny. It contains nothing but the alleged declarations of Bond. These could be easily made co-extensive with the claim of Mrs. Grace and without fear of contradiction. It is significant that the witness is a brother of Mrs. Grace; that if his interest were pecuniary he would require corroboration; that only one side of these conversations was given with nothing to show the circumstances leading up to them; that there should have been three such conversations, all in January, 1924, just before the death of Bond on February 4, 1924, and that these conversations all related to alledged declarations of Bond which could not be contradicted. The witness testified to no fact capable of being investigated or contradicted.

Opposed to this testimony, and inconsistent with it, is the testimony of Ellis G. Bond and the vice-president of the bank, which has been hereinbefore partially given; the finding in the safety box of the memorandum: "Deliver to Ellis G. Bond, my son, Weldon, N. C. Notify," which the vice-president testified he believed "the memorandum was made at the time the box was rented;" that it was made by him after Bond had instructed him that "in the event of his death to turn over the contents of that box to his son;" and the testimony of C. P. Word, an officer of the Savings Bank of Richmond, who after testifying that he was introduced to Ellis G. Bond by his father, R. J. Bond, about Christmas, 1923, was asked and answered as follows: "In what connection did you see or talk to him at that time, or what called your attention to him?

"A. Well; one of the clerks in the bank called my attention to the two gentlemen going back in the rear of the bank, and of course I went back right away to

see who they were; and I went back and noticed it was Mr. Bond, and he said he was just showing the son around in the bank, and so I came back, and as he passed by the vault, he showed his son, and says: 'I have got a box in there. I have got enough up in there, all right,' he says, 'and that man has the key.' I imagine he was speaking of Mr. Ball. He asked for Mr. Ball at that time. So of course he showed his son around the bank and went on out."

[15] Upon the record before us, we are of opinion that the testimony of the appellant, Mrs. Grace, as to the making of a gift to her by John R. Bond of the Liberty bonds aforesaid, is not corroborated by the evidence offered on her behalf on that subject.

Counsel have argued at length the sufficiency of the delivery to constitute a completed gift, but in the view we have taken it is unnecessary for us to consider that subject.

We find no error in the decree of the trial court, and it is, therefore, affirmed.

*Affirmed.*