# Richmond

RUTH SHOCKEY NICHOLSON, ET AL. *v.* HARRY A. SHOCKEY,
INDIVIDUALLY, AND AS EXECUTOR OF THE LAST WILL
AND TESTAMENT OF FANNIE C. SHOCKEY,
DECEASED, ET AL.

May 7, 1951.

Record No. 3768.

Present, Hudgins, C. J., and Eggleston, Spratley, Buchanan, Miller and Smith, JJ.

The opinion states the case.

*Hardee Chambliss, Jr.,* for the appellants.

*Charles Pickett* and *James Keith,* for the appellees.

EGGLESTON, J., delivered the opinion of the court.

Mrs. Fannie C. Shockey, a resident of Fairfax county, died testate on May 14, 1947, at the age of seventy-nine years. She left surviving her husband, Joseph L. Shockey, who was eighty-three or eighty-four years old, two sons, Harry A. Shockey, a member of the local bar, and Joseph A. W. Shockey, and three

married daughters, Mrs. Ruth Shockey Nicholson, Mrs. Margaret Shockey Hand, and Mrs. Catherine Shockey Stone.

Under the terms of her will Mrs. Shockey devised "a one-half life interest" in her home place to her husband in lieu of curtesy. All the rest of her property, "real, personal and mixed," she devised to her son, Harry A. Shockey, "for the purpose of distribution between himself and my other living children, then living, their heirs or assigns in such proportions as my executor, the above-named legatee or devisee, may deem appropriate for them to have." The will further provided that, "This power is to be left wholly within his discretion and not to be questioned," and was granted to him because of her "full faith and confidence in his ability and integrity."

On April 21, 1947, Mrs. Shockey closed the sale to the Virginia Electric & Power Company of a right of way across her homestead property in Fairfax county, for the sum of $16,200 cash, which was deposited in the Arlington Trust Company, Inc., at Arlington, Virginia. One-half of the amount was deposited in a joint account to the credit of "Fannie C. Shockey" and "Harry A. Shockey," and the other in a joint account to the credit of "Jos. L. Shockey" and "Harry A. Shockey."

According to the provisions printed on the signature cards,[1] the sums deposited in the two accounts were owned jointly by the respective depositors, "with right of survivorship," and were "subject to the check or receipt of either of them or the survivor of them."

On the day after these deposits were made, namely, April 23, Mrs. Shockey executed a deed, in which her husband did not join, conveying the homestead property to her son, Harry A. Shockey, in consideration of the sum of "five dollars * * * and

---

[1] "The undersigned joint depositors, hereby agree each with the other and with the above bank that all sums now on deposit heretofore or hereafter deposited by either or both of said joint depositors with said bank to their credit as such joint depositors with all accumulations thereon, are and shall be owned by them jointly, with right of survivorship and be subject to the check or receipt of either of them or the survivor of them and payment to or on the check of either or the survivor shall be valid and discharge said bank from liability. Each of the undersigned appoint the other attorney, with power to deposit in said joint account moneys of the other and for that purpose to endorse any check, draft, note or other instrument payable to the order of the other or both said joint depositors. Payment to or on check of the survivor shall be subject to the laws relating to inheritance and succession taxes and all rules and regulations made pursuant thereto. The rights or authority of the bank under this agreement shall not be changed or terminated by said depositors or either of them except by written notice to said bank which shall not affect transactions heretofore made. * * *"

other good and valuable consideration.'' This deed was recorded on July 3, 1947, after Mrs. Shockey's death, under circumstances hereinafter related.

On October 13, 1948, Harry A. Shockey filed a bill of complaint on behalf of himself individually and as executor of his mother's last will and testament, against his father, brother and sisters, praying for a construction of the will. Some months later in that suit a consent decree was entered in which it was adjudicated that the deed from his mother to him should be set aside, and that this real estate was subject to and should be administered under the terms of the will.

However, Harry A. Shockey claimed absolute title to the balance of the fund which had been deposited to his and his mother's joint account. He likewise claimed absolute title to any balance which might remain after his father's death in the joint account which had been opened to the credit of his father and himself.

Thereupon his brother and sisters filed the bill of complaint in the present suit against Harry A. Shockey, individually and as executor of their mother's will, and against their father, Joseph L. Shockey, to determine the status and ownership of the funds which had been deposited in the two joint accounts.

The bill alleged that the fund derived from the sale of the easement or right of way across the homestead property had come into the hands of Harry A. Shockey acting as attorney for and confidential advisor to his mother; that such fund was impressed with a trust in favor of Mrs. Shockey; that the deposit thereof in the joint accounts, with the right of survivorship in both to Harry A. Shockey, ''was not the free and voluntary act of Fannie C. Shockey;'' that she did not at the time ''have a full understanding either of her rights or of the legal effect of said deposits;'' that they were made as the result of the exercise by him ''of undue influence on his client and aged mother;'' and that because of the confidential relationship which existed between him and her, the transaction was invalid in so far as it operated as a gift to him of any interest in the fund.

The prayer of the bill was that the transaction whereby Harry A. Shockey had derived an interest in the deposits, other than that to which he was entitled under the provisions of his mother's will, be annulled and set aside; that the sum which had been deposited in the joint account of Harry A. Shockey and his mother should be decreed to be an asset of her estate and ad-

ministered under her will; and that the balance of the other deposit which had been made to the credit of Joseph L. Shockey and Harry A. Shockey, subject to the life estate of the father, should likewise be decreed to be an asset of the mother's estate and administered under the terms of her will.

After Harry A. Shockey's demurrer to the bill had been overruled, he filed an answer in which he denied that he had received the fund derived from the sale of the easement as the attorney for or confidential advisor of his mother. He alleged that the money had been paid to his mother who had deposited it in bank in the manner described; that such deposits had not been made as the result of any undue influence exercised by him upon her, but were her free and voluntary act. He further alleged that the title to or ownership of such fund remaining in the joint account of his mother and himself passed by operation of law to him; that the same would be true of any balance remaining in the other joint account after the death of his father; and that his mother's estate had no interest whatsoever in these funds.

Joseph L. Shockey, the father, filed no answer and made no appearance either in person or by counsel.

After an *ore tenus* hearing upon the issues thus drawn, the lower court entered a decree dismissing the bill on the ground that the evidence was "insufficient to sustain the allegations" therein. On this appeal from that decree we need consider only the assignment of error that the finding of the lower court is contrary to the law and the evidence.

The appellants do not minimize the full force and effect of the lower court's finding on the issues of fact on the *ore tenus* hearing. They concede that such finding is tantamount to an adverse verdict of a jury. Their argument on the insufficiency of the evidence to sustain the decree runs thus:

The evidence shows, as a matter of law, that Harry A. Shockey received the fund derived from the sale of the easement as the attorney for or confidential advisor to his mother; that a gift from her to him of that fund, or any interest therein, is presumptively invalid on the ground of constructive fraud or undue influence; and that in this situation the burden was on him to overcome that presumption by clear and satisfactory evidence that his mother had a full understanding of the nature of the transaction and made the deposits with the purpose and intent of bestowing upon him a complete title to the money, subject

only to her interest and that of her husband therein. This burden of proof, the appellants say, their brother has not borne.

Moreover, the appellants say, under Code, § 8-286, the validity of the alleged gift requires corroboration, and such corroboration is not found in the evidence.

In our opinion the position of the appellants is sound on both aspects of the case.

Although Harry A. Shockey insisted both in his answer and at the hearing that in the transaction between his mother and the Virginia Electric and Power Company he acted merely as her son or advisor, and not as her attorney, the circumstances and especially the documentary evidence conclusively refute that contention.

The purchase of the easement was negotiated on behalf of the Power Company by Franklin R. Murray. Mr. Murray testified that he first approached Mrs. Shockey either in December, 1946, or January, 1947, and that she referred him to her son, Harry A. Shockey, who she said was authorized to act for her, and who thereafter conducted all negotiations in her behalf for the sale of the right of way. Murray knew that Shockey was an attorney, and on April 16, 1947, wrote a letter to "Fannie C. Shockey and Joseph L. Shockey, c/o Mr. Harry A. Shockey, Attorney," confirming the verbal agreement reached between "your attorney and our company." Shockey acknowledged acceptance of the offer by this endorsement on the letter which he returned to Murray: "Fannie C. Shockey, Joseph L. Shockey, By Harry A. Shockey, Atty., Date: April 21, 1947."

The purchase price for the right of way was paid by a draft of Stone & Webster Engineering Corporation, agent for Virginia Electric & Power Company, payable to the order of "Harry A. Shockey, Atty. for Fannie C. and Joseph L. Shockey." Acknowledgment of the payment of the money was made by receipt which was signed, "Fannie C. Shockey, Joseph L. Shockey, By Harry A. Shockey, Atty." Neither Mrs. Shockey nor her husband was present when the draft and receipt were executed and delivered.

At the time the deposit was made the draft was endorsed in Harry A. Shockey's handwriting, "Harry A. Shockey, Atty. for Fannie C. and Joseph L. Shockey, Harry A. Shockey."

"Formality is not an essential element of the employ-

ment of an attorney. The contract may be express or implied, and it is sufficient that the advice and assistance of the attorney is sought and received, in matters pertinent to his profession." 7 C. J. S., Attorney and Client, § 65, p. 848.

Clearly, we think, the evidence here meets these requirements and shows that there was an implied relation of attorney and client between the son and mother.

As is said in 7 C. J. S., Attorney and Client, § 65, p. 848, "* * * where the necessary elements of a contract (of employment) exist, the creation of the relation is not prevented merely by the fact that a blood relationship exists between the attorney and client."

It is true that Shockey made no charge to his mother for his services, but that was not necessary to the creation of the relation of attorney and client. See 5 Am. Jur., Attorneys at Law, § 31, p. 279; 7 C. J. S., Attorney and Client, § 65-b, p. 849; *Shoup* v. *Dowsey,* 134 N. J. Eq. 440, 36 A. (2d) 66, 85.

It is well settled that a gift by a client to an attorney of funds which the attorney has in his hands is presumptively nugatory on the ground of constructive fraud, and the burden of proof is on the attorney to show by clear and satisfactory evidence that there was no, undue influence or undue advantage because of the relation, and that the client was fully informed as to the nature and effect of the gift. See 5 Am. Jur., Attorneys at Law, § 51, p. 290; 7 C. J. S., Attorney and Client, § 129, p. 971.

In *Thomas* v. *Turner,* 87 Va. 1, 12 S. E. 149, 668, this court said: "* * * all dealings between attorney and client for the benefit of the former, are not only regarded with jealousy and closely scrutinized, but they are presumptively invalid, on the ground of constructive fraud; and that presumption can be overcome only by the clearest and most satisfactory evidence. The rule is founded in public policy, and operates independently of any ingredient of actual fraud, or of the age or capacity of the client, being intended as a protection to the client against the strong influence to which the confidential relation naturally gives rise." See also, *Bruce* v. *Bibb,* 129 Va. 45, 49, 105 S. E. 570; *Stiers* v. *Hall,* 170 Va. 569, 577, 578, 197 S. E. 450, 454.

But the presumption of fraud or undue influence which casts the burden of proving the *bona fides* of the transaction upon the appellee, Harry A. Shockey, is not dependent upon the

existence of the relation of attorney and client between him and his mother. The rule is not limited to attorneys at law. It springs from any fiduciary relationship, and when such relationship is found to exist, any transaction to the benefit of the dominant party and to the detriment of the other is presumptively fraudulent. The same high standard of good faith and loyalty is required of an agent to his principal as of an attorney to his client. See *Byars* v. *Stone*, 186 Va. 518, 529, 530, 42 S. E. (2d) 847, 852, 853.

Admittedly, Shockey was his mother's agent in handling and consummating this transaction. But that is not all. It is quite clear from the evidence that a confidential relationship had existed between the mother and son over a period of years. He was a trained lawyer in the prime of life, while she was a person of limited education and of advanced years. According to his own testimony each reposed the greatest confidence in the other. He had furnished the purchase price for sundry pieces of property, had the titles taken in her name, and later had them conveyed by her to him.

In fact, just prior to his marriage he executed and recorded a deed for his own home property to his mother, which he says she held as "a straw person" for his benefit. He then had her execute and deliver a deed reconveying the property to him, and this deed he withheld from recordation. There was no satisfactory explanation of this unusual transaction other than the obvious effect of placing the property beyond the control of his intended wife.

As has been said, on the day after the deposit which is the subject of this suit had been made, his mother executed in his office a deed conveying the fee-simple title in the home place to him, a transaction which he concealed from his father, who did not join in the deed, and from his brother and sisters, until after his mother's death. According to his own testimony she gave him custody of this deed only for the purpose of placing it in the lockbox to which they had joint access. Although he admitted that there had been no legal delivery of this deed to him, and that he had no right to record it, he did so after his mother's death. It was this conveyance which he later agreed should be set aside.

In all of these transactions with his mother he was the dominant person, and she readily executed or accepted such deeds as he presented to her. That she fully understood and

comprehended the purpose and effect of these transactions is by no means clear from the evidence.

Although there is evidence that Mrs. Shockey was mentally competent to transact business on the day the deposit was made, the record clearly shows that her physical condition was not good. From January 14 to 31, 1947, both inclusive, she was a patient at the Arlington Hospital and left there against the wishes of her attending physician. From January 31 to April 19 she was at the home of her daughter, Mrs. Nicholson, and during that time was attended by two physicians. On April 19 she returned to her home near Falls Church and remained there until May 14, when she suffered a stroke and was taken to a hospital where she died.

The evidence with respect to the purpose of the deposit, as to whether Mrs. Shockey understood the nature of the transaction and intended thereby to make him a gift of an interest therein, comes only from the lips of Harry A. Shockey himself.

His story is that he advised his mother to divide the proceeds of the draft into two equal parts, and deposit one-half to her own credit and one-half to the credit of the husband, with the right of each to check on her or his share. He said she was unwilling to do this because, she said, her husband would "squander" his share, and the other children would importune her to give them her share of the fund. To avoid this, he said, she wanted the money deposited in such a manner that "I would have to sign with her so she would tell these children and my father we would open up a joint account and both of us would have to sign the checks together." Furthermore, she said, "I want you to have this money in the event of your father's death or my death."

Upon her insistence that she wanted the money deposited in this manner, he suggested that they discuss the matter "with the young lady in the bank," and see whether this could be done. They went to the bank where "the young lady," he said, explained the effect of the deposit to his mother "who fully understood it." After this explanation the necessary signature cards for the two accounts were prepared.

Mr. Shockey positively identified Mrs. Julia Lyle, an employee of the Arlington Trust Company, as "the young lady in the bank" who explained the deposit to his mother. However, when Mrs. Lyle was called as a witness on his behalf she signally

failed to corroborate his testimony. She did recall having opened the account with Mr. Shockey, and was "under the impression" that at the time he was accompanied by "an elderly lady." But she was not "absolutely sure" of that, and could not "definitely" "recall any discussion" with reference to the matter.

Mr. Shockey further testified that it was his mother's wish that the fund deposited to her and his joint account be subject to checks signed by either him or her, and that this arrangement was carried out.

As to the fund deposited to the joint credit of his father and himself, Mr. Shockey testified that it was his mother's wish and direction that the account be opened in such manner that all checks thereon be signed by both him (Harry) and his father. He admitted, however, that this account was not opened in this manner, that a joint account was established, with the right of either him or his father to draw thereon over his individual signature. Despite the manner in which the account was opened, he said that he told his father that all checks drawn thereon must be signed by both of them. He admitted on cross-examination that this statement was not true.[2]

He further admitted that his father continued under the impression that he was unable to check on the fund by a check bearing his (the father's) signature alone until he learned the truth from the other members of the family. In the meantime he (Harry) had checked the entire sum of $8,100 out of the father's account. He placed $5,948.66 in his own lockbox, but what disposition he made of the balance is not clearly shown.

He further testified that after his mother's death he drew out the fund deposited to her and his joint account and "spent it" "on the farm."

So far as the record shows, Mrs. Shockey discussed the nature of the deposits with the other members of the family on only

[2] "Q. Your father had the understanding it was necessary for both to sign?
"A. Yes.
"Q. As a matter of fact you told him that?
"A. Yes.
"Q. You were lying to him, weren't you?
"A. No.
"Q. What was it? It wasn't the truth, was it?
"A. It wasn't the truth.
"Q. It wasn't the truth?
"A. It was a question of law to me."

one occasion. Mrs. Nicholson, one of the daughters, testified that on the Saturday before her mother died, her mother told her that she had received $16,200 for the sale of the easement; that "$8,100 has been put in the bank in my name, and $8,100 has been put in the bank in your father's name, and Harry has brought each of us $100 and he wants us to spend $100 a month." Neither at this time nor at any other did Mrs. Shockey say or intimate to anyone that she had given to her son, Harry, an interest in the deposits.

Mr. Shockey further testified that he withheld from his brother and sisters until after their mother's death information as to the manner in which the money had been deposited and the fact that he had been given an interest therein.

At the time he disclosed to his brother and sisters what he characterized as the "complete story" of his recent dealings with his mother,—that is, the collection of the purchase price of the easement, the method in which the money had been deposited, and the execution by her of the deed conveying the home place to him,—he tendered to them for their signatures what he termed a "Cooperative Agreement." By the terms of this agreement the brother and sisters agreed "to the terms and conditions" of their mother's will, the deed to him for the home place, and further agreed "to cooperate and work with" him "in the execution of said estate and render all aid and assistance possible to him in his duties."

He was examined at length by the trial court as to the nature and purpose of this agreement. He finally admitted that it bound him to do nothing, that there was no consideration for its execution by the other parties thereto, and that neither he nor they were bound thereby. "I just wanted something in hand in the event there was any question," he said.

We, then, have these incidents which cast grave doubt upon the credibility of Mr. Shockey's story of his fair dealing with his mother with respect to the disposition of the deposits and a gift by her to him of an interest therein:

(1) His preparation of the deed whereby his mother, without the knowledge and signature of her husband, conveyed to him (Harry) the home place, and his recordation of this deed after her death, although he knew that it had not been delivered to him and that he had no right to record it.

(2) In his answer he denied that the money derived from the

sale of the right of way had passed through his hands and averred that it "was paid to the said Fannie C. Shockey and deposited by her." Upon being asked whether the check had been made payable to him, his reply was "I don't know." Only when the check was produced at a later date during the trial did he admit that it had been made payable to and endorsed by him, in the manner which has been stated, and that it carried no endorsement by his mother.

(3) The admitted fact that he did not deposit the fund in his father's account in the manner in which his mother directed.

(4) The admitted fact that he deceived his father with respect to the nature of the deposit which had been made for the father's benefit, and the father's right to draw thereon, with the result that he (Harry) had exclusive control of the fund.

(5) His inability to present evidence corroborating his testimony that the bank employee, Mrs. Lyle, had fully explained to his mother the nature and effect of the joint deposits and of his interest therein.

Moreover, a reading of his testimony as a whole shows numerous other contradictions, inconsistencies and discrepancies. Frequently questions with respect to material matters were answered, "I don't recall," or "I don't remember."

He could not "recall" just where the conversation took place between his mother and himself, in which she expressed the desire that the money be deposited in bank in such a way that he would have a joint ownership therein.

Questioned closely as to just what his mother had said with respect to such joint ownership, his answer was, "I don't remember. That was explained to her at the bank. She said she wanted me to have it in the event of her death."

We are not unmindful of the rule that the credibility of a witness and the effect of discrepancies in and the weight to be given his testimony is primarily for the trier of fact in the court below. But here the burden was on the appellee to overcome the presumption of constructive fraud by clear and satisfactory evidence. Such degree of proof means something more than a mere preponderance of the evidence. 32 C. J. S., Evidence, § 1023, p. 1059; 20 Am. Jur., Evidence, § 1253, pp. 1103-5.

In our opinion the testimony of Mr. Shockey, upon which his case mainly rests, when viewed in the light of the many discrepancies therein, the evidence of his unfair dealings with his

mother and father in closely related matters, and other surrounding circumstances, fails to measure up to the clear and satisfactory proof which is required to overcome the adverse presumption of constructive fraud and sustain his claim that his mother fully understood the nature and character of these deposits, and that she thereby intended to make him a gift of an interest therein.

Moreover, we are of opinion that Mr. Shockey's contention that his mother made him a gift of an interest in the deposits must fail for the further reason that his testimony on the subject lacks the corroboration required by Code, § 8-286. This section provides in part: "In an action or suit by or against a person who, from any cause, is incapable of testifying, or by or against the * * * executor, administrator, heir, or other representative of the person so incapable of testifying, no judgment or decree shall be rendered in favor of an adverse or interested party founded on his uncorroborated testimony; * * *."

While technically this is not a suit by Harry A. Shockey against his mother's estate or personal representative, it is in effect such a proceeding. He claims title to funds by virtue of a gift which he says his mother made to him during her lifetime, while the appellants claim that such gift is nugatory, that the fund should be paid to and administered by the executor under the terms of the will. Thus Harry A. Shockey is "an adverse or interested party" who seeks a decree against his mother's estate sustaining that gift. Under the terms of the statute such a decree cannot be "founded on his uncorroborated testimony." See *Grace* v. *Virginia Trust Co.*, 150 Va. 56, 142 S. E. 378; *Shenandoah Valley Nat. Bank* v. *Lineburg*, 179 Va. 734, 20 S. E. (2d) 541.

Whether or not corroboration exists and the degree and quality required are to be determined by the facts and circumstances of the particular case. *Trevillian* v. *Bullock*, 185 Va. 958, 963, 40 S. E. (2d) 920, 922; *Leckie* v. *Lynchburg Trust, etc., Bank*, 191 Va. 360, 370, 60 S. E. (2d) 923, 928.

Where, as here, a confidential relation existed between the parties at the time of the transaction relied on, a higher degree of corroboration is required than in ordinary transactions.

As has been pointed out, Mr. Shockey's claim that his mother fully understood the nature and effect of the deposits and intended to give him an interest therein, depends entirely upon

his own testimony. The bank employee, Mrs. Lyle, failed to corroborate his testimony that she fully explained the nature and effect of the deposits to Mrs. Shockey.

It is true that Mrs. Shockey signed the signature card on which is printed the lengthy agreement, which provided among other things, that either she or her son, "or the survivor of them," would have the right to check on the fund. But there is no evidence whatsoever that she read this provision, or that it was read to her, or that she was capable of understanding it. In this connection, it will be recalled that although her husband signed a similar signature card carrying a like provision, he did not comprehend its meaning and effect.

It is argued on behalf of Harry A. Shockey that evidence of the close relationship existing between him and his mother and of her particular affection for him is sufficient corroboration to validate the gift. If this amounts to any corroboration at all, it is very slight. Indeed, as we have seen, the close and confidential relationship of the parties emphasizes the necessity of subjecting the transaction to a close scrutiny and of requiring more than ordinary corroboration.

For these reasons the decree complained of is reversed and the cause remanded with directions that a decree be entered in the court below adjudicating that the alleged gift by Mrs. Shockey to her son, Harry A. Shockey, of an interest in these deposits be declared null and void and of no effect; that the balance in the joint account of Mrs. Shockey and Harry A. Shockey, unexpended by her or for her benefit during her lifetime, be paid to her executor to be held and administered by him under the terms of her will; and that the balance in the joint account of Joseph L. Shockey and Harry A. Shockey, unexpended by or for the benefit of Joseph L. Shockey during his lifetime be likewise paid to the executor to be administered under the terms of the will. By appropriate decrees or proceedings the said Harry A. Shockey should be required to account for such withdrawals as he may have made from the two accounts.

*Reversed and remanded.*

SPRATLEY, J., dissenting.

The controlling issue in this case is, as the majority opinion states, whether the finding of the trial court is contrary to the law and the evidence. Admittedly, there is evidence in support

of the chancellor's conclusion. It clearly is not incredible. There is no evidence of actual fraud. At most, there are circumstances sufficient to create a presumption of constructive fraud, a rebuttable presumption. The law is not in dispute. The burden of proof was on the appellee to overcome the presumption that the alleged gifts to him from his mother were constructively invalid because of the relationship between them. His testimony to that effect required corroboration.

The evidence was heard *ore tenus* before the chancellor without the intervention of a jury, and certified to us. In such a case, the rule of decision is that "the judgment of the trial court shall not be set aside unless it appears from the evidence that such judgment is plainly wrong or without evidence to support it." Code of Virginia, 1950, section 8-491.

The evidence shows the following uncontradicted facts:

Harry A. Shockey is a lawyer and has been engaged in the practice of his profession for nearly twenty-five years. He and his mother occupied the closest confidential relationship. He was a dutiful and helpful son, and she favored him above all of her children. From his early youth he had contributed largely to the support and welfare of his mother and her family. He assisted in educating his three sisters and brother, and out of his earnings paid the original purchase money mortgage on real estate which belonged to his mother. His father apparently was not frugal and contributed little or nothing to the maintenance of the home or the education of his children. None of the children aided their mother after they became wage-earners. One of the sons, Joseph A. W. Shockey, an appellant, constantly sought money from his mother. According to appellee and a disinterested witness, she upbraided that son for misappropriating funds belonging to her.

In 1925, Fannie C. Shockey made and executed her last will and testament. The will was not prepared by appellee and he did not see it until his mother's death. By her will, Mrs. Shockey devised to her husband, "a one-half life interest" in her home property, and gave all of the rest of her property, subject to that life interest, to appellee as executor and trustee, with directions to distribute the estate or proceeds thereof between himself and her other children, in such proportions as he might "deem appropriate for them to have." In expressing her feel-

ings towards appellee, she employed the following language in her will:

"This is my desire because I have full faith and confidence in his ability and intelligence.

"This power is to be left wholly within his discretion and not to be questioned."

It was wholly natural and logical that, with this regard for her son, Mrs. Shockey consulted him in her negotiations with the Virginia Electric & Power Company for the sale of her property rights. She did not seek the guidance and advice of her husband and remaining children for reasons sufficient to her.

Three physicians testified that up to a few days before her death, her mind was clear. Others who saw her a short time prior thereto said that she was mentally alert, seemed to be an educated woman, and was careful in her business transactions.

Regarding the deposits of the funds received from the Virginia Electric & Power Company, appellee testified as follows:

"My mother and myself discussed that matter on the morning the deposits were made. She wanted to see Dr. Bowen that day to have a physical check-up, so I told her I would advise she fix that up in a checking account so that she and my father could check that out later. She said no. She said, 'You know Joe got $1,900.00 or $2,000.00 from me. He got all my money.'

"Q. Her son?

"A. Her son, yes, and she said 'You know how your father is. I don't want him to take this money and squander it.' She said 'You know how he spends it.'

"Q. She said this?

"A. That was the conversation.
* * *

"Q. You go ahead and finish.

"A. And she said 'Whenever I get a cent of money, Joe is after it or Ruth is after it.' She didn't complain about Margaret and Catherine.

"I am very reluctantly telling this, but I am telling the truth and she said she wanted to keep it. She said I would have to sign with her so she would tell these children and my father we would open up a joint account and both of us would have to sign the checks together, and she said 'I feel it is due to you, all you have done on this farm and this home that the home exists today, and if it wasn't for you, it would not be here today and I

want this account opened in the manner it is and I want you to have this money in the event of your father's death or my death.'

\* \* \*

"Q. Yes, I want to know the reasons.

"A. Well, her reasoning of it was she felt in view of all that I had done for her and made it possible that the property existed and also put this deal through which she was very much elated over, that I should have it in the event of either of them dying. My suggestion to her in answer to that was: 'Mother, I think you should go to work and put it in a checking account so you would have half of it in your name and half in my father's name, so each of you can check on it.'

"She said: 'Oh, no. I have had experience with Joe and my children and I know what the results are. If I leave it in my name so I can check on it, Joe and the girls, if they find out about it, I won't have a penny very long. It will be gone.' And she told me about Joe having taken her bonds and cashed them and not giving her any security for them, and she said that was not fair. She said: 'You know that was not right, Harry.' I said, 'Well, that's your business.' She says, 'As to your father, if he had his way about it, he would squander every cent. He was never able to save or keep a cent.'

"I might add one other thing. She also mentioned one thing. She said: 'After the girls finished school and got their education, those girls went to town and kept their money and instead of contributing money to the home, they went to work for the Government and paid room rent and board in Washington instead of contributing to the home.' She said they were very anxious to stay at home while they were going to school and getting their education, but after they got their education, they stayed in town."

It will be observed that in making the deposits of the funds received from the power company, she carefully divided it into two parts, one of which she gave to her husband and her son, the appellee, and the other she provided for herself and appellee. The similarity between these deposits and the provisions of the will is marked. Two days after making the deposits, she executed a deed in fee simple conveying her homestead estate to appellee. All of this strikingly points to her desire to do more for appellee than for any one else. It is clear that she did not desire to make any provision for her remaining children. Her

written expression of gratitude, evidenced by her will, the deposit signature cards, and the deed testify in the strongest manner to her feeling of appreciation and gratitude towards appellee. She evidently thought that she had the right to dispose of her property as she pleased.

To say that Mrs. Shockey did not understand and comprehend the purpose and effect of the transactions with her son is a gratuitous reflection upon her intelligence, not warranted by a single fact or circumstance in evidence. She was not required to make a written claim of intelligence and understanding.

The comments on the testimony of Mrs. Lyle have no value. It is not unusual for an employee of a bank to fail to remember the circumstances of a deposit made during the busy hours of employment. We should not be critical about appellee's dealing with his father so as to prevent the latter from squandering the funds provided for him. The donor did not want them wasted. There was nothing despicable in the dealings between the appellee, his brother and sisters.

The suggested contradictions and inconsistencies in his testimony were explainable as due to the lapse of time and the change of circumstances in the several proceedings concerning his mother's estate. His actions were those of an obedient, dutiful, considerate and affectionate son towards his parents, in contrast to the concern manifested by his brother and sisters. His reward was natural and logical. Appreciation and gratitude are among the noblest of human traits, and when exhibited should be allowed effect.

In consideration of the evidence, we must bear in mind that the chancellor saw and heard the witnesses testify, and observed their manner and attitude. All of the facts and circumstances surrounding the negotiations and conferences between the appellee and his mother were presented to him in a more vivid picture than a printed record can show. He, of course, was aware of the interest of each party and the influence their interest had upon the testimony. That he gave consideration to the inconsistencies in the appellee's testimony is indicated by the language of his decree. "His conclusions on questions of fact are entitled to peculiar weight and consideration, and we must accept them just as we accept a jury's verdict, sustained by evidence which it might have believed." *First Nat. Bank* v. *Roanoke*

*Oil Co.,* 169 Va. 99, 192 S. E. 764; *Wyckoff Pipe, etc., Co.* v. *Saunders,* 175 Va. 512, 9 S. E. (2d) 318.

The chancellor accepted the testimony of the appellee as he had the right to do, and we are faced with the presumption that his conclusion was correct. The burden was on appellants to show error. *Smith* v. *Alderson,* 116 Va. 986, 83 S. E. 373.

It is conceded that the same weight should be given to the decision of a chancellor as if it were the verdict of a jury. In a large number of cases which have come to this court, we have uniformly refused to set aside verdicts as contrary to the evidence where there was involved the credibility of witnesses whose testimony the jury might reasonably believe, or the weight to be given to their testimony, or the question of a mere preponderance of the evidence. Whatever may have been our view as to the preponderance of the evidence, we have refused to set aside the judgment of a trial court unless we were able to say that the judgment was plainly wrong or without any evidence to support it. *Varner* v. *White,* 149 Va. 177, 140 S. E. 128. We considered the cases very much as upon a demurrer to the evidence. *Updike* v. *Texas Co.,* 147 Va. 208, 136 S. E. 591; *Virginia Elec., etc., Co.* v. *Blunt,* 158 Va. 421, 431, 163 S. E. 329.

Even doubts as to its correctness are not sufficient to bring a reversal in this court. *Graham* v. *Commonwealth,* 127 Va. 808, 103 S. E. 565; *Bragg* v. *Commonwealth,* 133 Va. 645, 112 S. E. 609.

We accept as true all facts favorable to the party in whose favor judgment has been entered. *Virginia Elec., etc., Co.* v. *Blunt, supra.*

Where the evidence consists of circumstances and presumptions, a new trial will not be granted merely because we would have arrived at a different conclusion. *Davis* v. *Commonwealth,* 132 Va. 525, 110 S. E. 252.

This case is not one of that exceptional character where we can say that the record discloses that the finding of the chancellor was plainly wrong and unjust. The gift to the appellee was not unusual under the circumstances recited. The undisputed facts provided a natural and logical basis for Mrs. Shockey's action in favor of appellee. The presumption of invalidity created by the relationship of the mother and her lawyer son was fully overcome when the chancellor became convinced

that the evidence clearly and satisfactorily showed Mrs. Shockey had a full understanding of the nature of the transactions.

What constitutes clear and satisfactory evidence upon any given question is dependent upon various considerations, circumstances, viewpoints, and, especially in the case of oral testimony, upon the opportunity to see, hear, and observe the witnesses testify. Men and judges may differ in their evaluation of testimony; but greater weight is and ought to be given to the conclusion of the one who has had the benefit of the opportunity to give consideration to all of the factors.

It is settled law of this State by cases too numerous to cite that the corroboration required when one party is incapable of testifying depends on no hard and fast rule, but upon the facts in each case. *Trevillian* v. *Bullock,* 185 Va. 958, 40 S. E. (2d) 920.

Section 8-286 of Code of Virginia, 1950, only requires such corroboration as would confirm and strengthen a belief in the testimony of the adverse witness. *Varner* v. *White, supra; Krikorian* v. *Dailey,* 171 Va. 16, 197 S. E. 442; *Shenandoah Valley Nat. Bank* v. *Lineburg,* 179 Va. 734, 20 S. E. (2d) 541.

Nor it is necessary that the testimony be corroborated in all material points. *Davies* v. *Silvey,* 148 Va. 132, 138 S. E. 513; *Morrison* v. *Morrison,* 174 Va. 58, 4 S. E. (2d) 776; *Heath* v. *Valentine,* 177 Va. 731, 15 S. E. (2d) 98; *Rorer* v. *Taylor,* 182 Va. 49, 27 S. E. (2d) 923.

In *Morrison* v. *Morrison, supra,* we held that Mrs. Morrison's testimony of loans made to her husband was corroborated by the production of cancelled checks for the precise amount, the dates of which corresponded to the bank's record of the credit of the amount to her husband's account, and by a provision in the will of her husband for the payment of debts due to his wife. Between the two there existed the most confidential of relationships.

In the present case, evidence of corroboration is stronger than in most of the cited cases. Here corroboration of the gift to appellee was expressly shown by the character of the deposits in his behalf, and by her actual signatures on the deposit cards. The signature cards of themselves constitute documentary evidence of the highest character. The repeated expression of her feeling of gratitude towards appellee served but to confirm and strengthen a belief in appellee's testimony that she willingly

favored him, with full knowledge of the effect of her acts. That she did act intelligently and of her own free will is confirmed by the evidence of independent witnesses concerning the relationship which had long existed between appellee and his mother. Nothing that she did runs counter to common experience under like circumstances. Her actions were in accord with the impulses of appreciation and gratitude.

It is only where the narrative to be corroborated runs contrary to common experience, that more is required than where it is in line with common experience. *Trevillian* v. *Bullock, supra.*

The evidence strongly indicates that Joseph L. Shockey was not fully competent to handle money to the best advantage. This accounts for the manner and means provided by Mrs. Shockey for his welfare, and likewise supports the action of appellee in refraining from telling his father that the deposit to their joint account could not be checked on without the signature of both.

Joseph L. Shockey did not appear in the proceeding or answer the pleadings. He makes no claim that he was misinformed or deceived as to his rights by appellee. He does not ask that the latter be required to replenish the deposit in his favor, nor complain that the fund has been improperly dissipated.

When we disregard the statutory rule of decision, by weighing conflicting evidence and judging the credibility of witnesses in arriving at a conclusion opposite from the one reached by the chancellor, and modify our former construction of Code, section 8-286, we begin to multiply the difficulties we will hereafter encounter in the practical adjudication of cases coming within the purview of those statutes.

Appellants, under established principles, come to this court with the presumption that the decree of the chancellor is correct. The burden upon them to show that it is plainly wrong has not, in my opinion, been successfully borne.

I would affirm the decree appealed from.