## CIRCUIT COURT OF HENRICO COUNTY

First Federal Savings
and Loan Association of Erie

v.

H. Franklin Minor

Case No. 76-L-445

August 17, 1979

BY JUDGE L. PAUL BYRNE

In the instant case, plaintiff (First Federal) sues the defendant (Minor) for damages in the amount of $119,000.00 for his alleged negligence in reporting to First Federal on September 26, 1973, that he had filed for record at the State Corporation Commission and at the Clerk's Office of the Circuit Court of Chesterfield County, Virginia, certain financing statements under the Uniform Commercial Code securing First Federal and its assignor, Virginia National Bank (VNB), covering all chattels, fixtures, and other articles of personal property and all issues, rents, and profits derived therefrom on the property of Lemon Tree Inn of Richmond, Inc., (Lemon Tree) being 26,795 acres located on Willis Road at I-95, and, further, that said financing statements constituted "a good and valid security agreement and represent a first and paramount lien on the chattels," when in fact said financing statements did not represent a first and paramount lien on said chattels. First Federal alleges in its Motion for Judgment that Minor was employed by it for such purposes through First Federal's agent, Mortgage Investment Corporation, now VNB Mortgage Corporation (VNB Mortgage), and in reliance

upon such certification, it disbursed the final $450,000.00 of its loan to Lemon Tree. Further, First Federal alleges that Minor in failing to report certain previously filed financing statements of other creditors and in certifying that plaintiff had a first and paramount lien on the chattels of Lemon Tree without taking exception to the said previously filed financing statements of other creditors, negligently breached his contract of employment.

Minor filed a Plea of the Statute of Limitations to the Motion for Judgment and requested a hearing on the Plea for the purpose of determining the nature of his relationship with First Federal.

The matter was heard ore tenus on August 5, 1977, and at that hearing, Minor testified that he was engaged by Henry Conner, a licensed attorney, to handle the legal work for Lemon Tree, Conner's client (including title examination, preparation and recording of documents, and certification) necessary to comply with the conditions of a two-phase mortgage loan commitment issued to Lemon Tree by First Federal through its Virginia agent, Mortgage Investment Corporation, now VNB Mortgage (Tr. 14–18). The mortgage loan commitments were obtained by Lemon Tree for the purchase and expansion of a motel facility in Chesterfield County, Virginia.

Minor was furnished a copy of First Federal's loan commitment and a copy of VNB's construction loan commitment and with these in hand prepared the deed of trust note, the deed of trust, and the buy-sell agreement used in connection with the loan (Tr. 19) (Pl.'s ex. 1, 2, and 3). Minor further admitted that he familiarized himself with the loan commitments prior to preparing the buy-sell agrement (Tr. 22).

Subsequently, the first phase of the loan was extended (Pl.'s ex. 6 and 7), and Minor agreed on behalf of Lemon Tree to pay interest on the $650,000.00 initial advance from August 7, 1972, until closing. On September 20, 1972, VNB delivered to Minor in trust the $650,000.00 initial advance to close the first stage of the loan (Pl.'s ex. 4 and 5) to secure a first lien on the Lemon Tree property as outlined under the loan commitments (Pl's. ex. 1 and 2) (Tr. 23 and 24). In accord with plaintiff's exhibit 4, Minor filed for record in the Clerk's Office of the Circuit Court of Chesterfield County, Virginia, (File No. 15756), on September 20, 1972, a financing statement, covering all chattels, fixtures, and other articles of personal property, etc., of Lemon Tree (Pl.'s ex. 9). Minor admitted signing this financing statement as agent for the secured party, Virginia National Bank (VNB) (Tr. 34), without any express authority from VNB.

Further, Minor caused to be issued by Lawyers Title Insurance Company (title company) a policy of title insurance, Policy No. R-72918, dated September 20, 1972, insuring the mortgage loan of VNB and/or First Federal to Lemon Tree in the face amount of $1,100,000.00 (Pl.'s ex. 8). Schedule B, Part II of the title policy contains a pending disbursement clause limiting the liability of the title company to the extent of the amount of the loan actually disbursed, i.e., $650,000.00.

On September 5, 1973, William D. Grove, closing attorney for VNB Mortgage, wrote to Minor advising him of the expiration date, September 20, 1973, for the closing of the second stage of the loan commitment, i.e., $450,000.00, and requesting that Minor furnish him with certain instruments and documents "for review" prior to the final disbursement (Pl.'s ex. 12). Included among the necessary items requested were:

1. Financing statement and recorder's receipt from the State Corporation Commission; and

2. Minor's certification that the financing statement as filed locally and with the State Corporation Commission represented a first and paramount lien on the chattels of Lemon Tree.

In compliance therewith, Minor furnished the required certification in his letter of September 26, 1973, to VNB Mortgage (Pl.'s ex. 11). The parties have stipulated that the Statute of Limitations was tolled in this action on September 24, 1976, although plaintiff's suit was not filed until November 29, 1976.

### The Issues

There are two issues to be resolved in this suit:

1. Under the facts in this case, what was the relationship between Minor and First Federal as to the certification of the chattel lien; and

2. Which Statute of Limitations is applicable to that relationship?

### Opinion

The defendant, Minor, contends that he was employed by the borrower, Lemon Tree, and not the lender, First Federal, as contended by the plaintiff. A careful and diligent search of the authorities in Virginia discloses that the Supreme Court of Virginia has not had the opportunity to deal with the factual situation represented by this case, and it presents a matter of first impression.

Counsel for the defendant in his memorandum, concedes that a non-client plaintiff in an action based upon an attorney's profes-

sional negligence is faced with three differing views as to the existence or nonexistence of a cause of action against the attorney. Those differing views are:

1. No cause of action can be stated against the attorney because no privity of contract exists. In those states upholding this view, the Courts have steadfastly held that the attorney's liability exposure extends only to his immediate client because of the lack of privity. See annotation: *Attorneys - Liability to Third Parties*, 45 A.L.R. 3d 1181.

2. An attorney may be liable for his negligence to third party non-clients under a theory of the third party being a beneficiary of the contract between the attorney and his client. *Lucas v. Hamm*, 56 Cal. 2d 583 (1961).

3. An attorney may be liable for his negligence to third party non-clients under a theory that privity of contract is not essential and that recovery should be allowed on the basis of tort liability for a breach of duty owed to persons reasonably expected by him to rely on his work. *Biakanja v. Irving*, 49 Cal. 2d 647, 65 A.L.R.2d 1358 (1958).

The defendant urges the Court to disregard the first view requiring privity of contract and concedes that such a view is inconsistent with intelligent modern thinking. For this proposition, the defendant cites *McPherson v. Buick Motor Company*, 217 N.Y. 382, 111 N.E. 1050 (1916), as the lead case in which the privity requirement began to assume less importance in one area of the law after another. He suggests that the Court should recognize liability to third parties under certain circumstances where the attorney negligently renders services he should have recognized as involving a foreseeable injury to some third persons.

The defendant further urges the Court to adopt either the second or third view, preferably the third, and hold that the liability of the attorney be limited to those classes of third persons who are deemed by the Court to be reasonably expected to rely upon the work product or representations of the attorney. The defendant concedes that this is a desirable result and that mortgage lenders would certainly qualify for such designation.

The plaintiff, on the other hand, contends that the relevant facts and the law applicable thereto establish that the rendering by Minor to First Federal of the chattel lien certificate was pursuant to an attorney-client relationship between First Federal and Minor. First Federal contends that the Court need go no further than the generally

accepted definition of the attorney-client relationship as stated in 7 Am. Jur. 2d, *Attorneys at Law*, § 91, as follows:

> The authority of an attorney begins with his retainer, but the relationship of attorney and client is not dependent on the payment of a fee, nor is a formal contract necessary to create this relationship. The contract may be implied from conduct of the parties. *The employment is sufficiently established when it is shown that the advice and assistance of the attorney are sought and received in matters pertinent to his profession.* (Emphasis added). See also *Nicholson v. Shockey*, 192 Va. 270 (1951); *Brasseaux v. Girouard* (La. App.), 214 So.2d 401 (1968); and *Erickson v. Civic Plaza National Bank of Kansas City* (Mo. App.) 422 S.W.2d 373 (1967).

The plaintiff argues that the facts disclose that the advice and assistance of Minor in matters pertinent to his profession was first sought and received by First Federal in connection with the preparation of buy-sell agreement (Pl.'s ex. 3) and with the closing of the first phase of the loan in September, 1972 (Pl.'s ex. 4). Subsequently, the advice and assistance of Minor in such matters was again sought by First Federal on September 5, 1973 (Pl.'s ex. 12) when, by letter addressed directly to Minor, First Federal's agent, VNB Mortgage, requested Minor to furnish First Federal "for review," among other things "your certification that the financing statements as filed locally and with the State Corporation Commission represent a first and paramount lien on the chattels." The advice sought was then received by First Federal in the form of a letter written by Minor dated September 26, 1973, directly to First Federal's agent which, after identifying the filed financing statements in question, contained Minor's opinion that "the financing statements constitute a good and valid security agreement and represent a first and paramount lien on the chattels." (Pl.'s ex. 11.)

Plaintiff contends that this exchange of letters in September of 1973 between VNB Mortgage, the agent of First Federal, and Minor established an attorney-client relationship between them, if such a relationship did not previously exist, because they contain without question the two essential elements required by the definition of an attorney-client relationship, *supra*, i.e., when the advice and assistance of the attorney in matters pertinent to his profession are (1) sought and (2) received.

In rebuttal, Minor argues that he could not be the attorney for First Federal because his contract of employment was with Lemon Tree, the borrower, and the interests of the borrower and the lender are not compatible. Further, he argues, that to hold that First Federal is the third party beneficiary of the attorney-client employment contract with Lemon Tree would expose the Court to further consideration of the propriety or ethics of an attorney representing conflicting interests.

Yet, in the instant case, Minor testified that better than 50% of his practice was real estate (Tr. 30). When questioned on cross-examination, Minor disclosed that in residential transactions, it is common practice in the Richmond area for an attorney to represent both the buyer and the seller in the same transaction, but it would be uncommon in commercial transactions (Tr. 32). He also acknowledged having represented both the borrower and the lender in the same residential real estate transaction (Tr. 32). Obviously, this argument is inconsistent because common experience would indicate that there would be just as much conflict between buyer and seller and borrower and lender in residential transactions as there would be in commercial transactions between the same parties. The question of propriety or ethics in representing both parties to the same transaction would be present in both situations. This Court considers such an argument without merit.

The Court also rejects the defendant's argument with regard to the in-house counsel of the lender. Based upon its own experience and the general knowledge among the lawyers who practice real estate law, such counsel only serve in a review function, i.e., to review the documents and certifications prepared and submitted by the closing attorney for substantive content and compliance with the conditions of the loan commitment. Certainly, it is common knowledge that in-house counsel of the lender do not go behind the closing attorney into the various record rooms to check on the recording dates which serve as the basis for the title examination and certifications submitted by the closing attorney.

Based upon its own experience and general knowledge of the real estate bar, having practiced considerably in that field for approximately 27 years prior to ascending the bench, this Court finds that the closing attorney, such as Minor in the instant case, usually does not come into such a transaction, whether it be for a purchase or the construction of a commercial unit, until the mortgage loan commit-

ment has been applied for by the purchaser and/or borrower and approved by the lender. In a construction transaction, there may be an interim construction loan commitment by a local lending institution with a permanent loan commitment or take-out by an out-of-state lending institution as in the instant case. At the time of the receipt of the loan commitment, the closing attorney is employed at the expense of the borrower for two purposes:

1. To examine the title to the property in question and to prepare the necessary instruments and documents of certification to enable the loan to be closed on behalf of the borrower; and

2. To certify the title and other required matters to the lending institution so that, in reliance upon such certification, the lending institution will disburse the funds under the mortgage loan commitment to enable the borrower to complete the project.

In such a situation, this Court is of the opinion that the attorney, in accepting employment, wears two hats. He represents the borrower and also the lender, and not only is he charged with foreseeing that the lender will rely upon the performance of his professional services, but, in fact, he knows that the lender will rely upon such performance. Therefore, it is the opinion of this Court that it makes no difference whether it holds that an attorney-client relationship exists between the lender and the closing attorney by virtue of the peculiar nature of the transaction or that the relationship exists because the lender is a third party beneficiary of the contract between the borrower and the closing attorney. In either event, the relationship is contractual, and an action for the breach thereof lies in contract and not in tort.

In *Oleyar v. Kerr, Trustee*, 217 Va. 88 (1976), the Supreme Court held "an action for the negligence of an attorney in the performance of professional services, while sounding in tort, is an action for breach of contract and thus governed by the Statute of Limitations applicable to contracts." *See also, McCormick v. Romans and Gunn*, 214 Va. 144 (1973).

Having concluded that a contractual relationship existed between Minor and First Federal, the applicable Statute of Limitations is as contained in § 8–13 of the Code of Virginia, as amended, providing: If it be upon any other contract express or implied within three years
. . . ."

Therefore, the statute began to run on September 26, 1973, and was tolled by agreement of the parties on September 24, 1976. Ac-

cordingly, this action is not barred by the Statute of Limitations, and the defendant's plea is overruled.

July 25, 1980

BY JUDGE E. BALLARD BAKER

First Federal Savings and Loan Association of Erie brought this Motion for Judgment against H. Franklin Minor seeking money damages, alleging that Minor, an attorney employed by First Federal, made an incorrect certification to it with respect to financing statements.

Evidence was heard on April 1, 1980, and memoranda have been filed.

Lemon Tree, Inc., some time in 1972, desired to purchase and add to an existing motel in Chesterfield County. Financing for this was necessary.

By a commitment of June 16, 1972, First Federal agreed to make a $1,100,000.00 two-stage loan to Lemon Tree, $650,000.00 to be on the existing 52 room motel and $450,000.00 after the construction of 60 additional units. The loan was to be secured by a first mortgage, covering the motel and all personal property. (Pl. Ex. 1.) The Virginia National Bank provided a temporary loan of $450,000.00 as interim lender for the construction loan, under a Buy-Sell Agreement of July 20, 1972, with First Federal, accepted by Lemon Tree. (Pl. Ex. 2, 3.)

On September 20, 1972, Virginia National, through its subsidiary Mortgage Investment (later known as VMB Mortgage Corp.), wrote Minor, enclosing its check for $650,000.00 for closing the initial phase. This was to secure a first lien on the Lemon Tree property as outlined in prior commitments of Virginia National (Pl. Ex. 2), and First Federal (Pl. Ex. 1). The letter (Pl. Ex. 4) required that the title policy insure Virginia National and First Federal of a first lien and required that certain exceptions in the title binder be deleted. There had been prior letters to Minor from Mortgage Investment regarding the transaction. (Pl. Ex. 6, 7.) A title insurance policy insuring Virginia National and First Federal in the amount of $1,100,000.00 was issued September 20, 1972, showing no exclusions as to personal property, chattels, or fixtures. (Pl. Ex. 8.)

Minor had come into the transaction earlier at the request of counsel for Lemon Tree to do the title work (Tr. 8–5–77, p. 14) but did much more than that as the matter progressed.

Minor disbursed the $650,000.00 after preparing and securing execution of the necessary papers reflecting the loan and also recorded the deed of trust and a financing statement, # 15756, showing Lemon Tree as debtor and Virginia National as the secured party in Chesterfield. No financing statement covering the loan was recorded with the State Corporation Commission at this time.

On September 21, 1972, Mortgage Investment advised First Federal of the loan closing, enclosing copies of various documents and stating that additional instruments would be sent within ten days. These included a copy of "recorded Financial Statement to be filed with the State Corporation Commission." (Pl. Ex. U.)

A letter of November 8, 1972, from Mortgage Investment to First Federal transmitted several of the documents referred to in the September 21st letter, but there was no mention of the finance statement to be filed with the S.C.C. (Pl. Ex. I.)    In the spring of 1973, Lemon Tree acquired certain personal property for use in the motel, and financing statements relating to this personal property were duly filed, one with the State Corporation Commission on April 11, 1973, and a second in the Clerk's Office of the Circuit Court of the City of Richmond on April 11, 1973. Leasing Company, organized pursuant to agreement with South Carolina National Bank to purchase and lease personal property as part of a lease financing program for the Bank (SCNB), provided the personal property to Lemon Tree, had the financing statements filed as indicated, and assigned its lease and lien on the property to SCNB, in accord with its agreement. (Pl. Ex. A.)

In the late summer of 1973 came the time for First Federal to provide the additional $450,000.00 under its agreement with Virginia National, the latter having made the money available to Lemon Tree under its interim financing agreement.

On September 5, 1973, Mortgage Investment wrote to Minor relating to this final disbursement and stating certain documents which would be required, including (1) a financing statement and recorder's receipt from the S.C.C. and (2) his certification that the financing statements as filed locally and with the S.C.C. "represent a first and paramount lien on the chattels." (Pl. Ex. 12.)

By letter of September 26, 1973, Minor advised Mortgage Investment that he had filed financing statements at the S.C.C. and in Chesterfield covering the chattels, fixtures, and personal property relating to the Lemon Tree Inn. The S.C.C. filing was as of September

25, 1973. Minor also stated his opinion that "the financing statements constitute a good and valid security agreement and represent a first and paramount lien on the chattels." (Pl. Ex. 11.)

On September 28, 1973, Mortgage Investment sent to First Federal a copy of the S.C.C. filing and a copy of Minor's September 26 letter. (Pl. Ex. K.)

On October 15, 1973, First Federal sent the $450,000.00 to the Virginia National Bank. (Pl. Ex. L.)

Lemon Tree subsequently defaulted on the note held by First Federal.

After default, the existence of financing statements recorded at the S.C.C. on furniture, fixtures, and personal property by SCNB on April 11, 1973, by RCA Service Company on November 1, 1972, and by two others became generally known and were presented as liens on the fixtures, etc., in the Lemon Tree Motel having a priority over First Federal's lien. It also appears that Minor was aware of these filings at the time he filed the First Federal financing statement on September 25, 1973, and when he wrote his opinion letter of September 26, 1973. (Pl. Ex. W.)

The issue in this case relates to the liability of Minor to First Federal for his opinion that First Federal had a first and paramount lien on the chattels when he was aware of the prior filings of SCNB and RCA. Litigation developed in Chesterfield Circuit Court with respect to the priority and validity of the liens of SCNB and First Federal.

There was a foreclosure of Lemon Tree Inn on June 30, 1976, and in accord with an agreement between SCNB and First Federal, $57,678.60, the appraisal value of the chattels was withheld pending the outcome of the Chesterfield litigation. SCNB prevailed over First Federal and received the money.

First Federal seeks to recover this amount from Minor, and the additional amount of $4,200.00, this representing the value of television sets removed from the Motel by RCA under its recorded leases prior to the foreclosure sale.

### The Issues

Counsel have set forth eight issues in their memoranda, and each will be commented on. In addition to those issues, it appears to me that the effect of the fact that Minor was hired as attorney by Lemon Tree must be considered in discussing some of the issues, and this will be done.

1. *Did First Federal rely on having a first lien on the chattels, and did it rely on Minor's certification letter of September 26, 1973?*

Minor acknowledges that First Federal required a lien on the chattels but argues that it required not a first lien but a lien which would allow it to cure a default.

First Federal's commitment to Lemon Tree of June 16, 1972, requires "a first mortgage on the real property . . ." in the first paragraph, and in paragraph 9 states that "The mortgage shall cover all personal property owned by you, used or to be used in the operation of the property . . . ." Title insurance is to be provided, with no exceptions except as approved by its counsel, and the title report is to include a security agreement (chattel mortgage search). (Pl. Ex. 1.)

The VNB commitment which First Federal bought also requires "a first security interest in all chattels, fixtures, and other articles of personal property now or hereafter located on, or used in connection with, the Security Property . . . ." (Pl. Ex. 2.)

The deed of trust from Lemon Tree, dated July 26, 1972, and drawn by Minor, supports the intent of the noteholder to have a lien on the chattels, specifically describing the property to include the land and all improvements, fixtures, equipment, and other personal property. (Pl. Ex. N, at p. 2 and 6.) The deed of trust also provided that Lemon Tree would not permit any lien on the property without written consent of the noteholder.

Other factors supporting First Federal's view are discussed in its memoranda and will not be commented on further here. Two positions urged by Minor do require comment.

There is testimony that in the spring of 1973, First Federal was approached by United Leasing with respect to Lemon Tree. An exchange of letters shows that United Leasing was considering leasing to Lemon Tree personal property to be used in the motel and that First Federal took the position that it would be willing to be named jointly as the secured party relating to such property. (Def. Ex. B, C, D, E, F.) However, no agreement was reached.

Also, at this time, First Federal had not received any certificate evidencing the recordation of its security interest in the equipment with the S.C.C., though it had been advised that such would be forthcoming. First Federal had received a document relating to recordation of the interest in Chesterfield County.

There is force in the argument that in the spring of 1973, First Federal was not really concerned about a first and paramount lien on the equipment and wanted nothing more than a right to cure.

However, when Minor made his certification in September, 1973, First Federal wanted a first and paramount lien, and under the positive requirements in the commitments to it and Virginia National and the deed of trust, First Federal was entitled to such a lien. Minor was familiar with all the documents and knew that the investor, First Federal, wanted the first lien. Whatever First Federal may have been content with in the spring of 1973, in September, 1973, it wanted and was entitled to a first lien.

If First Federal had been advised that it did not have a first lien on the chattels, it would not have been obligated to produce the $450,000.00. First Federal did rely on Minor's certification.

*2. Was Minor's rendering of the chattel lien certificate pursuant to an attorney-client relationship between First Federal and Minor?*

This point was approached by Judge L. Paul Byrne of this Court on August 17, 1979, when he ruled on a plea of limitations filed in this case. Rejecting the defendant's contention that the tort limitation was applicable, Judge Byrne held the contract limitation was proper because there was either an attorney-client relationship between First Federal and Minor, or First Federal was a third-party beneficiary under the contract between Lemon Tree and Minor. To determine the question now raised, that holding must be further considered.

Minor's testimony relative to his involvement in this is in the transcript of the August 5, 1977, hearing, pages 13–38. Briefly, he was asked by a Richmond attorney for Lemon Tree to do a title examination on the motel Lemon Tree proposed to buy. This he did, submitting the report to Virginia National. Minor thereafter drew the note, the deed of trust, the buy-sell agreement between Virginia National and First Federal and had copies of the Virginia National and First Federal commitments. (Tr. 8–5–77, p. 19–23.) He also applied for the interim title insurance binder and the title insurance which insures Virginia National and First Federal. He was aware that the first $650,000.00 was First Federal's money when the first phase of the loan closed. (Tr. 8–5–77, p. 26–28.)    It also appears that when he was asked in September, 1973, for the certification, he knew that Virginia National had completed disbursement of the $450,000.00 it was obligated for. (Tr. 8–5–77, p. 30.)

eral and knew that First Federal was to buy from Virginia National the $450,000.00 loan balance. His dealings with the loan closing in its initial stage had been through Mortgage Investment, the subsidiary of Virginia National, and in my view, Virginia National and Mortgage Investment were acting on behalf of First Federal in this final closing.

I conclude that Minor was acting as attorney for First Federal when he wrote his certification letter.

(Not really relevant to the facts here, but in accord with the general view stated above, is a quote found in *Ayyildiz v. Kidd*, [220 Va. 1080] decided April 18, 1980, by the Supreme Court of Virginia, that an attorney is liable only to his client and is not liable for negligence to an opposing party where there is no foreseeable reliance by that party on the attorney's conduct).

3. *Was First Federal's lien inferior to that of SCNB and RCA?*

Both sides agree that the RCA lien on the television sets, represented by the financing statements filed by RCA, is superior to that of First Federal. There is disagreement relative to the SCNB lien.

The SCNB lien was filed with the S.C.C. on April 11, 1973. (Pl. Ex. X[31].) SCNB did not file in Chesterfield County, mistakenly doing so in Richmond. Under § 8.9–401(1)(C), a filing with the S.C.C. and in Chesterfield County was required to perfect the SCNB security interest.

The financing statement protecting First Federal was filed in Chesterfield County on September 20, 1972, by Minor (Pl. Ex. 9), and in the S.C.C. on September 25, 1973, at which time the SCNB lien was observed by Minor. (Pl. Ex. W [41].)

First Federal's position is that its lien is inferior to that of SCNB despite SCNB's failure to record in Chesterfield because it is bound by the knowledge Minor had of SCNB's interest when he recorded on September 25, 1973. Minor's position is that First Federal took a contrary position in litigation on this in Chesterfield and is estopped to assert its present position.

On the point of imputing Minor's knowledge to First Federal, the following statement appears in 7 Am. Jur. 2d, *Attorneys at Law*, § 138.

> For example, where the attorney is acting for several clients at the same time and in the same business, as when he represents both a vendor and a purchaser or a mortgagor and a

mortgagee or purchaser and seller or guarantor of corporate stock, knowledge which he acquires in the transaction may be imputed to all.

Cases in support can be found in 4 A.L.R. 3d 245–249, particularly *Farr v. Newman*, at 4 A.L.R. 3d 215, and 199 N.E.2d 369.

The same general rule can be found in 7A C.J.S., *Attorney-Client*, § 183.

I find no discussion on whether that rule is qualified in any way where the basis of the person claiming against the attorney is that he is a third party beneficiary of a contract between the attorney and others, or where he is merely one whom the attorney knew would rely on his title search or certification.

However, I believe that is immaterial to the present facts. Minor was acting for First Federal in September, 1973, and also for Lemon Tree, and the result of his certification, as known to him, was the release of $450,000.00 by First Federal. Under these circumstances, the conclusion is that Minor's knowledge of the SCNB filing is imputed to First Federal.

Both sides seem to accept the proposition that if First Federal does have knowledge, then its lien is inferior to that of SCNB.

The estoppel argument advanced by Minor in discussion of this issue will be commented on later.

On this issue, my view is that First Federal's lien is inferior to that of SCNB.

(No point is raised in the memoranda as to what would be the effect on this issue if SCNB had filed in Chesterfield County in the spring of 1973 and had seen, or been charged with knowledge of, First Federal's filing in Chesterfield on September 20, 1972. For this reason, that point is not considered).

4. *Was Minor negligent in the performance of his duty to First Federal?*

Upon the testimony presented, I am bound to conclude that Minor was negligent in not disclosing the existence of the prior filings at the S.C.C. See generally cases cited at 59 A.L.R. 3d 1190–1198.

I note that this is the act of negligence charged against Minor in the Motion for Judgment. It is this act which First Federal says caused its loss, not any failure to record in September, 1972, at the S.C.C.

5. *Was Minor's negligence the proximate cause of First Federal's loss?*

If Minor had reported the prior liens of SCNB and RCA to First Federal, under the Buy-Sell Agreement, First Federal would not have had to pay Virginia National the additional $450,000.00 for the purchase of the Lemon Tree note of $1,100,000.00. What consequences could flow from that will remain forever unknown.

What is known is that Lemon Tree subsequently defaulted on the note which First Federal acquired, that foreclosure was held and the value of the equipment, $57,678.60, was set aside from the amount First Federal would otherwise have received. This amount later went to SCNB as a result of the Chesterfield County suit.

In addition, the television sets were removed from the motel prior to the foreclosure. The value of the sets was $4,200.00. It would appear those sets would increase the foreclosure sale price or, as First Federal suggests, could have been sold separately.

If Minor's certificate had been correct, First Federal would be ahead of SCNB and RCA. However, there is no way in which his certificate could have been correct, assuming, as counsel do, that SCNB is ahead of First Federal just because it filed first at the S.C.C. and Minor knew it. SCNB had filed. That could not be changed.

If this action was based on a failure to perfect the first lien, the relationship between that failure and the loss of the chattels as security would have been clear. Not so clear is the relationship between Minor's failure to correctly advise of the SCNB and RCA liens in September, 1973, and the loss at foreclosure or the value of the chattels at foreclosure, as the amount of damages.

As a general rule, damages for breach of contract are determined as of the date of breach. While the amount owing to SCNB and RCA as of September 26, 1973, is known, there has been no effort to establish that as the damages. Under the doctrine of avoidable consequences, it is not at all certain that the First Federal loss could have been established at that amount, even if First Federal had been immediately aware of the breach. It does appear that the payoff of the security interests on September 26, 1973, was about $160,000.00. Had First Federal known the true situation in September, 1973, a resolution of the problem would have involved a consideration of its being in second place as to that much value.

However, not knowing the true situation, First Federal paid out $450,000.00 without having the full security it had a right to expect.

While the precise damage it sustained as a result cannot be determined, it did sustain damage as a result of the certification. It was unable, through lack of proper information, to pursue other available courses.

> When it is certain that substantial damage has been caused by the breach of a contract, and the uncertainty is not whether there have been damages, but only as to their true amount, there can rarely be any good reason for refusing all damages due to the breach merely because of that uncertainty. (5B M.J., *Damages*, § 14.)

The breach here relating to the chattels, the value of those chattels can be considered as being within contemplation of the parties. It does not appear unreasonable or speculative to hold that Minor's breach was a proximate cause of damage to First Federal and that the measure of that damage is the value of the chattels or the amount necessary to pay off the security interests of SCNB and RCA in the chattels, whichever is less, as of the date of foreclosure, June 30, 1976.

*6. Has the amount of damages sustained by first Federal been proven?*

Both parties appear to agree that, assuming liability and causation, damages should be determined as of the foreclosure date, June 30, 1976, and the amount should be the value of the chattels on which First Federal had no first lien.

First Federal says the value of the chattels is $57,678.60, plus $3,792.00 applicable to the television sets removed by RCA.

The stipulation, Pl. Ex. 1, in paragraph 11 states that by agreement of July 15, 1975, First Federal, SCNB, and the trustee under the defaulted note and deed of trust agreed that the property covered by the SCNB lien "would be appraised, sold at public auction in conjunction with the trustee's foreclosure sale of the real property of Lemon Tree Inn, and that a portion of the proceeds of the sale in an amount equal to the appraised value of the personal property would be held . . ." until the priority of the claims of SCNB and First Federal were determined. Paragraph 12 of the stipulation acknowledges an inventory and appraisal of this personal property was conducted pursuant to the agreement and a valuation of $57,678.60 fixed.

The property was sold along with the real estate on June 30, 1976. There was no separate sale of the chattels. Under the Agreement, this

does not seem necessary. The Agreement bound the parties to a value of $57,678.60 for the chattels, permitted their sale in the foreclosure, and fixed the amount of the loss. Whether the loss would be sustained by First Federal or SCNB would depend on the "priority and validity of the respective liens . . . ."

Minor, of course, was not a party to this Agreement of July 15, 1975, and argues that, as to him, First Federal must establish the value as of June 30, 1976.

First Federal presented evidence of an appraisal of March 1, 1976, putting the value of the Lemon Tree property, including chattels at $950,000.00, with a value of $800.00 per room for the furniture and miscellaneous fixtures. The appraisers noted the difficulty of valuing the chattels separately from the motel, and it was admitted that the appraisal could have been $950,000.00 without the chattels.

As noted in discussing proximate cause, the fact that First Federal's loss of its priority in the chattels is the result of a failure to perfect its lien in September, 1972, or at any time before SCNB perfected its lien and not the result of Minor's certification of September 26, 1973, makes questionable the determination of damages based on the value of the chattels.

The fact remains, however, that Minor's certification in September, 1973, caused First Federal to pay out $450,000.00, relying in part on a first lien it did not have on the chattels and prevented First Federal from other courses of action it could have taken in the fall of 1973, the result of which cannot be known. As the encumbrance not revealed by Minor in September, 1973, related to the chattels and as no other effective way of determining damages is available, fairness seems to compel the use of the value of the chattels as the measure of damages.

If the value of the chattels on June 30, 1976, is the measure of damages, evidence of their appraised value on June 15, 1975, is relevant as is the testimony of the appraiser who made an appraisal of Lemon Tree in March, 1976. The appraisal of July 15, 1975, is directed solely to the chattels. The March, 1976, appraisal was a going motel with a per room appraisal or allocation.

The July, 1975, appraisal impresses more than the March, 1976, appraisal as to the value of the chattels, and a value of $57,678.60 as of July, 1975, is accepted. The chattels were sold as part of the motel in June, 1976. First Federal's appraiser spoke of a 10% depreciation of motel personal property and, while this was in a context not re-

lated to the July, 1975, appraisal, it does seem that the chattels would suffer some loss of value between July, 1975, and June, 1976. Consequently, a 10% depreciation is appropriate to the July, 1975, appraisal. This results in a value of the chattels as of June 30, 1976, of $51,915.74.

As to the television sets, RCA was allowed by the Chesterfield Circuit Court to repossess them in early 1975. No evidence of their value at that time is provided. The balance due on the television leases was $3,792.00, but what the sets were reasonably worth is not shown. I do not believe their value has been shown. Accepting that the correct measure of damages is the value of the personal property as of June 30, 1976, I conclude that First Federal has proven damages of $51,915.74.

7. *Are damages reduced because of the mortgage insurance payment or because of the delay in foreclosure caused by bankruptcy proceedings?*

Damages in this case are measured by the value of the chattels as to which First Federal had no security lien. It is not shown how the mortgage insurance or the delay in foreclosure affected those values, except to the extent of depreciation which has been allowed to the defendant.

8. *Is First Federal estopped by judicial estoppel from claiming that it did not have a first lien?*

On November 29, 1976, First Federal filed this Motion for Judgment in which its conflict with SCNB and RCA was mentioned, and under the deed of trust, it claimed against Minor because it did not have a first lien as stated in his certificate.

At that time, First Federal and the substitute trustee had already filed a Bill of Complaint in the Circuit Court of Chesterfield County asking for appointment of an emergency special receiver. This Bill of Complaint made reference to the various financing statements and the conflicts relating thereto. (Pl. Ex. O.) In April, 1977, First Federal filed an Answer to a cross-bill against it in Chesterfield by SCNB, contending that First Federal had a first priority perfected security interest in the chattels. (Def. Ex. G.) At that time, the Motion for Judgment in Henrico County was pending on a Plea of Statute of Limitations filed by Minor.

By letter of October 11, 1978, Judge Gates in Chesterfield County sustained a motion to strike the evidence of First Federal on the doctrine of judicial estoppel urged by SCNB.

It thus appears that the inconsistent position asserted against First Federal first appeared in Chesterfield after the Henrico suit was begun. The Chesterfield suit was dismissed because of what was found to be an inconsistent position. So far as this Henrico case is concerned, the position of First Federal remains consistent with the original position.

*Burch v. Grace Street Building*, 168 Va. 329 (1937), is the controlling Virginia case on inconsistent positions. However, at page 340, it is said that "he will be confined to that which he first adopts . . ." The same effect, see *Thrasher v. Thrasher*, 210 Va. 624 at 628 (1970).

No authority has been cited which would deny First Federal the right to continue to maintain its first position, and consequently, I do not believe the estoppel position taken by the defendant can be sustained.