# CIRCUIT COURT OF PITTSYLVANIA COUNTY

Moncie Lee Doss

v.

Emma D. Doss
and Bobby B. Doss

December 6, 2008

Case No. CL08-81

BY JUDGE WILLIAM N. ALEXANDER, II

I have read the transcripts, considered the written closing arguments, all motions, and all evidence presented. The family members will be referred to by their first names.

This case involves an 84 year old Pittsylvania County tobacco farmer, Moncie Lee Doss, who quit school in the first grade; who could neither read nor write; who suffered a total loss of hearing in one ear at a very young age and later suffered such a severe loss of hearing in the other ear that it could not be corrected by a hearing aid; who married and raised four children, Virginia Belcher, Emma Doss, Brenda Jacobs, and Douglas Doss; who in 1992 lost his wife, the person upon whom he depended and trusted to keep his books, write his checks, and otherwise help manage his affairs; and who, in spite of his lack of education and disability, managed to accumulate a farm, equipment, personal property, and money valued in excess of one million dollars.

Following Moncie's wife's death, he remained at his farm home, where Virginia cared for him by cooking, cleaning, laundering his clothes, paying his bills, seeing to his medical appointments, etc. Essentially, Virginia took over the managerial duties Moncie's wife had performed during their marriage. This relationship continued until November of 2005 when Emma and her husband, Bobby, told Moncie that Virginia was stealing money from him.

Emma went to Virginia's house accused her of stealing Moncie's money and demanded that she give her all the keys to her father's house and that she stay away from Moncie. Thinking this was her father's wishes, she did so.

Emma and Bobby also convinced Moncie that Douglas had stolen from him and that Brenda could get him on child abuse because of what he had done to her as a child. All of these statements about the children were false. Having separated Moncie from his other children, Emma and Bobby began caring for him, with Emma promising that she would care for him and his money.

On May 30, 2006, Emma and Moncie went to the American National Bank and met with Kathy Shelton concerning Account # 1206, then a joint account in the names of Moncie and Emma. Moncie earlier had added Emma's name to the account. The balance in the account was $58,243.00. Moncie had made all deposits to this account. At Moncie's request, his name was deleted from the account leaving it solely in Emma's name. Moncie explained he did this so that Emma could take care of his money and denies he intended to gift the account to her. Emma claims that this was a gift to her and that all money later deposited in that account was a gift to her. Only Moncie made any deposits to this account.

Emma testified that, while Moncie was changing the account to her name, he told Ms. Shelton that he was making a gift to her. According to Ms. Shelton, Moncie made no such statement. During the period from May 30, 2006, until February 10, 2008, Moncie deposited additional funds into the account totaling $735,716.00, all of which Emma claims belonged to her.

On this same day, Emma and Moncie went to the Farm Services Agency, met with Tammy Wright, and executed a document she claims transfers future payments under the tobacco buyout to her. She maintains her father did this as a gift to her. There were seven remaining annual payments of $31,724 each. Moncie denies he intended to give Emma the future payments, but did so the just so the payments would come to her to use for him. Ms. Wright testified that she explained to Moncie that he was transferring the payments to Emma. She did so in a normal voice and thought he appeared to understand. She acknowledged that she did not know that he could neither read, write, nor hear.

Less than a month later, on June 22, 2006, Emma and Moncie again went to the American National Bank. Moncie endorsed a check in the amount of $589,712.00 payable to him from Lionel Reynolds, a local auctioneer, and Emma deposited the check into Account # 1206. Moncie also endorsed the deposit slip. This money was the proceeds from the sale of Moncie's farm.

Emma maintains this was a gift to her and, again, claims that Moncie told her in Ms. Shelton's presence that he was making a gift to her. Ms. Shelton again refutes Emma's claim.

Vince Kania, a C.P.A. who traced the deposits and disbursements of Account # 1206, testified that, of the $793,959.00 deposited and withdrawn he could find no significant disbursement made for the benefit of Moncie. This testimony is unrefuted.

"[T]he law does not presume a gift and where a donee claims title to personal property by virtue of a gift *inter vivos*, the burden of proof rests upon him to show every fact and circumstance necessary to constitute a valid gift by clear and convincing evidence." *Rust v. Phillips*, 208 Va. 573, 578, 159 S.E.2d 628 (1968) citing *Grace v. Virginia Trust Co.*, 150 Va. 56, 142 S.E. 378 (1928). A gift requires donative intent. *Chappell v. Perkins*, 266 Va. 413, 420, 587 S.E.2d 584 (2003).

Emma fails to prove by clear and convincing evidence that Moncie intended to make gifts of virtually all his property to her. This would still be true if her burden was to prove gift by a preponderance of the evidence. Emma's testimony is not credible. She has intentionally given false testimony during the course of the trial. She claims Ms. Shelton was told by Moncie he was making gifts to her of the bank account and farm proceeds. Ms. Shelton clearly refutes this testimony. Nothing supports Emma's contention of gift except her own testimony. In contrast to Emma's testimony, Moncie's testimony is credible.

Bobby, while not actually present at the three transactions detailed, was complicit in and participated in Emma's scheme to get her father's money. He helped alienate the other children from Moncie by deliberately telling him falsehoods about them. Bobby is a convicted felon and I find his testimony incredible. He participated in spending the money taken and benefited from the expenditures.

Moncie shall recover the sum of $793,959.00, the total of the funds deposited to account # 1206 (listed in Plaintiffs' Exhibit # 16) and taken by Emma and Bobby; $120,000.00, the sale proceeds of the Knollwood house and not deposited into the account; $5,000.00, the cash taken by Emma from the Barkhauser check before the remaining $20,000.00 was deposited, and $222,068.00, the total amount of the future tobacco payments. Moncie is entitled to $1,141,027.00 from Emma and Bobby. These figures do not agree with Mr. Kania's figures shown on Plaintiffs' Exhibit 16. There appears to be an error in addition on that exhibit.

Furthermore, Bobby and Emma shall execute a deed to the Blue Ridge property to Moncie; execute a deed of trust on the Leftwich property in the amount of $183,000.00; transfer all future tobacco payments through the Farm

Services Agency to Moncie; place a lien on all vehicles owned by either, or both, of them; and cause the remainder of funds located in their attorneys' bank account to be paid to Moncie.

I find there was a fiduciary relationship created between Moncie and Emma, that she was his agent, and that she breached the fiduciary duties owed Moncie. This relationship was not based on the power of attorney executed by Moncie to Emma. The facts of this case detailing the relationship between Moncie and Emma establish the agency. Likewise, Moncie's causes of action for fraud, conversion, and detinue have been proven by the evidence.

Moncie has also established that his liberty was restrained and without any cause. Without reciting the facts in detail, for almost two years, Emma and Bobby secluded Moncie in their home by disabling his vehicles so he could not leave on his own, prevented contacts with his friends, prevented his use of the telephone, used scare tactics to prevent contact with his other children and his friends, had his other children served with notices telling them they would be charged if they came to see him, told him that Bobby was a Federal agent assigned to watch him, lied to his friends when they came to see him or called on the telephone, restricted him from going to church, and almost totally deprived him of his freedom. Moncie freed himself on a cold night, January 10, 2008, by prying open a door at night and, clothed only in a thin coat and pants, walked some ten miles toward Virginia's house until he got help at a 7-11 store. It is interesting to note that, during this time while Emma and Bobby were supposedly taking care of him, Moncie lost forty-five pounds. For the false imprisonment, Moncie shall recover the sum of $100,000.00 as compensatory damages. He shall recover punitive damages in the amount of $50,000.00 because of the outrageous conduct of Emma and Bobby.

Moncie has failed to establish an intentional infliction of emotional distress. This cause of action will be dismissed.

Moncie is entitled to recover his wife's pictures, his phone, his father's picture, his wife's watch and ring, furniture, and any other property left at Bobby and Emma's house on the night he escaped or otherwise in their possession. I intend to award pre-judgment interest.