## CIRCUIT COURT OF THE CITY OF RICHMOND

Third District Committee

v.

H. Franklin Minor

June 23, 1975

Case No. D-8120

BY JUDGE ALEX H. SANDS, JR.

This is a proceeding instituted by the complainant, Third District Committee of the Virginia State Bar, against defendant, H. Franklin Minor, praying that defendant's conduct be found to be in violation of Disciplinary Rule 6–101(A)(3) of the Code of Professional Responsibility and that the defendant be reprimanded therefor and enjoined from further engaging in such conduct.

It has been stipulated that the Court shall consider as the evidence in this proceeding the testimony and proceeding before the Third District Committee of the Virginia State Bar upon the basis of which the matter was argued by counsel for plaintiff and by defendant appearing *pro se* on June 11, 1975.

### Facts

The evidence in the case presents no conflict of any significance and is substantially as follows.

Defendant had represented the Pond (sellers) family as attorney in several matters prior to the instance out of which this proceeding arises. At some time in the spring of 1970 and prior to the fall of 1971, the Ponds's son, Tommy, informed defendant that his father was desirous of selling a piece of property located in Hanover County and brought defendant several deeds of past conveyances thereon for defendant's inspection. Defendant was contacted by Herbert Pond by phone and advised as to the net amount which Pond desired to realize from any sale. Defendant opened a tentative file at

that time and concluded from a preliminary title examination that there was a one-fifth outstanding interest in the property in an incapacitated member of the family, which interest, along with a question of ingress and egress, defendant felt would have to be cleared up prior to the consummation of any sale.

Defendant then contacted a Mr. Walton Harris, a real estate agent with whom Pond then listed the property for sale. On October 2, 1971, Harris procured a contract for the sale of the property executed by Mr. Pond as seller and Mr. and Mrs. Alsobrook as purchasers. The papers were immediately thereafter turned over to defendant to handle the closing. All parties understood that in view of the incompetent's interest, a court proceeding would be necessary to secure court approval of the sale. Alsobrook was advised by Harris that his approximate closing costs would be a $30.00 fee to defendant, a percolating charge of some $100.00, and a title insurance premium of some $170.00 and was told to contact defendant direct as to the progress of the closing.

Alsobrook shortly thereafter contacted defendant and was told that due to the pressure of year-end tax work, defendant would not be able to begin work on the necessary court approval until after the first of the year. Mr. Pond died in the summer of 1972.

Nothing appears to have been done by defendant in the matter until January 22, 1973, at which time defendant instituted a proceeding in the Circuit Court of the County of Hanover seeking court approval of the sale in the form of a suit for the sale of an incompetent's land.

On May 8, 1973, Judge Simpkins wrote defendant that he wanted to confer with defendant concerning some procedural questions, and at this conference, which took place shortly after the judge's letter, Judge Simpkins stated that he would require the proceeding to be in the nature of a partition suit, rather than a suit for the sale of an incapacitated person's property. On August 8, 1974, more than a year later, an amended bill of complaint was filed by defendant posturing the case in the form as directed by Judge Simpkins. A decree of reference was entered shortly thereafter and a Commissioner's hearing was scheduled for October 1, 1974, which was the status of the case at the time of the Third District Committee of the Virginia State Bar hearing.

The value of the property in question has increased since the execution of the sales contract, though the amount of increase is not in

evidence. Beginning shortly after the contract of sale was executed and at regular intervals thereafter over the entire three-year period up to the filing of the amended bill of complaint in the partition suit, the Alsobrooks called defendant on some twenty-five different occasions, and upon each occasion, were given the assurance by defendant that the consummation of the sale would be shortly forthcoming. In addition to this, on several occasions, both Harris and other representatives of his company telephoned and wrote defendant urging action in the closing of the contract without results. Finally, on July 30, 1973, Mrs. Alsobrook wrote defendant threatening action in the absence of some immediate action on the part of defendant. Defendant never responded to this letter.

At no time during this period of three years did defendant ever see either Mr. or Mrs. Alsobrook face to face, nor was there ever any telephone conversation between them specifically concerning the question of whether or not defendant was representing the Alsobrooks as their attorney. There was never any formal contract of employment entered into between the Alsobrooks and defendant. On July 5, 1975, a complaint against defendant was filed with the Third District Committee of the Virginia State Bar by the Alsobrooks.

## Questions Before the Court

There are three issues which the court must resolve:

(a) Was defendant's conduct during the period in question per se violative of Disciplinary Rule 6–101(A)(3) of the Code of Professional Responsibility?

(b) Was the relationship between the Alsobrooks and defendant that of attorney and client?

(c) If the relationship between defendant and the Alsobrooks was not that of attorney and client, do the Alsobrooks have "standing" for the purpose of preferring charges against defendant?

## Questions Considered

### (a) Nature of Defendant's Conduct

Disciplinary Rule 6–101(A)(3) under which plaintiff is proceeding provides "(A) A lawyer shall not . . . . (3) Neglect a legal matter entrusted to him."

There could be but little argument advanced that the conduct of the defendant did not violate this rule in the most flagrant manner. While granted that the handling of this matter, in view of the neces-

sity of securing court approval, was more burdensome than the run-of-the-mine real estate closing, yet this is no justification whatsoever for a delay of three years between the date of the sales contract and the date upon which the first effective action was taken. Defendant had very nearly completed his title examination even before the contract was signed, yet it was over a year after the signing of the contract that the next step, the filing of the first bill of complaint, was filed.

While the change in procedures necessitated by Judge Simpkins' position should not be charged against defendant, yet defendant's failure to initiate the change for a year and a half after the judge had made it clear that an amended procedure would be necessary, is well nigh inexcusable.

The fact, moreover, that all during this two and one-half years' delay defendant was persistently urged and begged by the purchasers and the interested real estate agents to go forward with the work and that such efforts by the purchasers to secure action were either ignored or passed off with unfulfilled promises by defendant, does little to strengthen his defense.

It must be held, therefore, that defendant's behavior amounted to the grossest neglect of the business of closing the loan which had been entrusted to his care.

(b) *Attorney Client Relationship*

It is defendant's position that even though it should be assumed that he was guilty of neglect of the business which had been entrusted to him, no attorney-client relationship existed between him and the Alsobrooks and that he owed them no duty of representation and that, therefore, they have no standing to complaint of any misfeasance upon his part.

It is quite true, as plaintiff contends, that there was no formal contract of employment between defendant and the Alsobrooks either written or verbal. The circumstances surrounding the handling of the closing, however, as shown by the overwhelming evidence in the case, supports the view that the relationship between defendant and the Alsobrooks was, indeed, that of attorney and client.

Defendant frankly admits that in closings of this nature, the attorney handling the closing frequently represents both purchaser and seller and that, indeed, he had handled a number of closings in which he had so acted. He knew, throughout the three-year period in question, that the Alsobrooks had no other attorney and that they were

looking to him to handle all of the closing transactions, including those performed for the Alsobrooks. Yet, on none of the numerous occasions when Mr. or Mrs. Alsobrook would urge him to act and complain of his failure to do so did he ever directly or indirectly suggest to them that he was not handling their interests. There certainly could have been no doubt in his mind upon receipt of Mrs. Alsobrook's letter to him of July 30, 1973, that they considered him as their attorney and yet even then he made no effort to dispel this belief upon the part of the Alsobrooks.

Defendant's testimony (Dep. p. 97) is significant:

Q. Well, why did Mr. and Mrs. Alsobrook call you soon after the contract came in, do you suppose?

A. Do you want me to speculate about it?

Q. I want you to tell me what was in your mind at the time you received the phone call.

A. They called and I, quite frankly, don't remember what the conversation was about, the words . . . .

Q. Well, you led them to believe you would handle whatever was necessary for Court approval, isn't that correct?

A. Yes.

Q. And you led them to believe it wouldn't be a hassle, it wouldn't be a problem, and that it would be done in routine fashion.

A. I don't think I ever indicated anything differently to them, no.

On direct examination, defendant is asked the following question, and in response, gave the following answer:

Q. Did you ever talk with Mr. and Mrs. Alsobrook about or did they ever employ you as attorney?

A. I can understand, though, that they might have thought I was their attorney *because we did talk on the telephone a lot of times*. (Emphasis added.)

Then, following defendant's testimony, one of the Committee put this critical question to defendant's counsel:

Mr. Cudlipp: Just one question: my recollection is Mr. Minor testified he could understand why the Alsobrooks thought he was representing them. Now if he had that idea and did nothing, in all this period, to dispel it, don't you think that he is in the same position as if he were in fact attorney for them?

To this question, defendant's counsel answered frankly: "That could be argued."

This question pinpoints the fact upon which the answer to the question of the relationship between the Alsobrooks and defendant hinges. The answer clearly must be "yes."

The relationship of attorney and client need not depend upon any contract between the parties but may be *implied* from the acts of the parties. 2A Mich. Jur., *Attorney and Client*, p. 473. Nor is the relationship dependent upon the payment of fees. *Idem.* See also, although dictum, the expression of the Court to this effect in *Glenn v. Haynes*, 192 Va. 574 (1951). As Justice Eggleston states in *Nicholson v. Shockey*, 192 Va. 270, 277 (1951):

> Formality is not an essential element of the employment of an attorney. The contract may be expressed or implied, and it is sufficient that the advice and assistance of the attorney is sought and received, in matters pertaining to his profession.

Clearly, under the facts of this case, the relationship of client and attorney existed between defendant and the Alsobrooks.

(c) *Standing, Independent of Attorney-Client Relationship*

But even though the relationship of attorney and client did not exist between defendant and the Alsobrooks, the latter would, nevertheless, have standing to make this complaint. As has been often said, an attorney is an instrument or agency to advance the ends of justice. 7 Am. Jur. 2d, *Attorney at Law*, § 3.

The three-year delay involved in this case has placed the Alsobrooks in such position that they might well be prejudiced. In the first place, the property was to be the site of a home to be built thereon by the Alsobrooks. The cost of building has increased greatly over the past three years, and regardless of the outcome of the closing procedures, the home, if now built, will cost substantially more than it would have cost had the sale been closed at the time when it should have been closed. Again, the value of the property having increased substantially since the time at which the contract was executed, there is the possibility that court approval of the sale will be more difficult to obtain at this late date.

### Conclusion

A breach of Disciplinary Rule 6–101(A)(3) does not, of course, involve moral turpitude, nor does it constitute any reflection upon

either the character or the integrity of the offender. It involves acts of omission rather than commission. This fact, however, must not be allowed to create the impression that this Rule is of lesser importance than those with character implications. The time-honored adage that "justice delayed is justice denied" is particularly applicable to the attorney-client relationship, and there are few things which impair the image of justice in the eyes of the public more than procrastination on the part of the lawyer in the dispatch of business which has been entrusted to him for handling.

For the above reviewed reasons, defendant will be held under the facts of this case to be in violation of Disciplinary Rule 6–101(A)(3) and will be reprimanded as provided by law.