# CIRCUIT COURT OF THE CITY OF MARTINSVILLE

Hancock Park Capital, III, L.P.

v.

Locke Lord, L.L.P.

September 13, 2013

Case No. CL13-126

BY JUDGE G. CARTER GREER

In this legal malpractice action, Hancock Park Capital, III, LP ("Hancock Capital" or "plaintiff"), which is the grandparent entity of American of Martinsville, Inc. ("AMI") and Barcolounger Corporation ("BC") (collectively "the subsidiaries"), alleges that Locke Lord, L.L.P. ("Locke Lord" or "defendant"), a law firm that the subsidiaries retained in connection with their bankruptcy and restructuring, was negligent by failing properly to advise Hancock Capital of the requirements of the Worker Adjustment and Retraining Notification Act ("WARN Act"), 29 U.S.C. §§2101, *et seq.* Specifically, the plaintiff avers that, "[a]s Locke Lord held itself out as being competent to practice in the area of labor and employment law, Locke Lord knew, or should have known, that, under the WARN Act, Hancock Capital had potential liability as under a 'single employer' theory. . . ." Complaint, ¶ 38. The plaintiff further alleges that the defendant "did not offer any advice as to the specific requirements for a WARN Act notice in order to bring it in under the 'faltering company' or the 'unforeseen circumstances' exceptions to the sixty day notice requirement," Complaint, ¶ 69, and that, "[s]ince Locke Lord did not advise that WARN notices be issued, no WARN Act notices were issued at the time of the plant closure on April 16, 2010." Complaint, ¶ 71. The plaintiff further alleges that, as a result of the failure to give a legally sufficient WARN Act notice, displaced workers filed a class action lawsuit against Hancock Capital, which eventually settled the case for the sum of $429,992.34, excluding attorney's fees of $262,429.04. In the alternative, the plaintiff pleads that, "[b]ecause Hancock Capital, as the 100% owner of the [s]ubsidiaries was the only party that stood to gain or lose from [the efforts to recapitalize and/or liquidate the subsidiaries], Hancock Capital was clearly and definitely intended to be a third-party beneficiary of the retention agreement. . . ." Complaint, ¶ 85.

The defendant has filed a motion craving oyer of the retention agreement ("retention agreement" or "engagement agreement") between Locke Lord and the subsidiaries. Since the plaintiff does not oppose the motion craving oyer, the court grants the motion and will consider the retention agreement in ruling on the demurrer. *See Ward's Equipment v. New Holland North Am.*, 254 Va. 379, 382, 493 S.E.2d 516 (1997) ("When a demurrant's motion craving oyer has been granted, the court in ruling on the demurrer may properly consider the facts alleged as amplified by any written agreement added to the record on the motion.").

The defendant has also filed a demurrer asserting that, "[a]s evidenced by the [e]ngagement [a]greement, Locke Lord did not have an attorney-client relationship with Hancock Capital," and that "Hancock Capital is not identified, expressly or impliedly, in the [e]ngagement [a]greement as being a client of Locke Lord." Demurrer, ¶ 3.

Citing various rules of professional conduct, the defendant further states that "[t]he mere fact that Hancock Capital (a) is the corporate grandparent of AMI and BC, (b) alleges that it paid Locke Lord's fees on behalf of AMI and BC, and (c) has its officers on the boards of directors of AMI and BC does not create an attorney-client relationship between Locke Lord and Hancock Capital." Demurrer, ¶ 4. The defendant implies in its memorandum that, under the Rules of Professional Conduct, a lawyer may not simultaneously represent a corporation and its constituents. Reply Memorandum in Support of Demurrer at 3. It is true that "[a] lawyer employed or retained by an organization represents the organization acting through its duly authorized constituents." *See* Va. R. Prof. Conduct 1.13(a). However, Rule 1.13(e) states that "[a] lawyer representing an organization may also represent any of its directors, officers, employees, members, shareholders, or other constituents, subject to the provisions of Rule 1.7."

In addition, the defendant points to the facts of the subsidiaries' bankruptcy cases: (1) that Locke Lord performed a conflicts check in which it "determined that it did not currently represent and had not previously represented Hancock Capital," (2) and that, in their application to employ Locke Lord, the debtors stated that the partners, associates, and employees of Locke Lord have no connection with any of their creditors and are "disinterested persons," within the meaning of the Bankruptcy Code. Demurrer, ¶¶ 6-7. The defendant further states that "[t]he Bankruptcy Court specifically found that Locke Lord did not hold or represent an interest adverse to the bankruptcy estates of AMI and BC," and that "[t] he Bankruptcy Court could not have made this finding if Locke Lord had represented Hancock Capital as Hancock Capital now claims." Demurrer, ¶ 8.

Lastly, the defendant maintains that the third-party beneficiary claim must fail as a matter of law because the plaintiff has failed to allege that the

contracting parties "executed the [e]ngagement [a]greement with the intent of conferring a direct benefit on [Hancock Capital]." Demurrer, ¶ 12.

The law pertaining to the consideration of a demurrer is well-settled. "A demurrer accepts as true all facts properly pleaded, as well as reasonable inferences from those facts." *Steward v. Holland Family Properties*, 284 Va. 282, 286, 726 S.E.2d 252, 252-54 (2012). In another recent case, the Supreme Court of Virginia stated that, "[a]t the demurrer stage, it is not the function of the trial court to decide the merits of the allegations set forth in a complaint, but only to determine whether the factual allegations pleaded and the reasonable inferences drawn therefrom are sufficient to state a cause of action." *Friends of the Rappahannock v. Caroline County*, 286 Va. 38, 44 (2013). *See also Fun v. Virginia Military Inst.*, 245 Va. 249, 252, 427 S.E.2d 181 (1993) (a demurrer "tests the sufficiency of factual allegations to determine whether the motion for judgment states a cause of action"). In ruling on a demurrer, the court may not take into account matters beyond the allegations of the aggressive pleading. Consequently, the court will not consider the defendant's statements in its demurrer as to the specific facts of the subsidiaries' bankruptcy cases, for the complaint does not mention those facts, nor are they fairly implied from the allegations of the complaint.

Accordingly, the court must accept as true the following facts, which are alleged in the complaint.

Hancock Capital, a private equity firm, owns 100% of the shares of Martinsville Holding Corporation, which, in turn, owns 100% of the shares of AMI. Complaint, ¶ 5. Hancock Capital also owns 100% of the shares of Recliner Holding Corporation, which, in turn, owns 100% of the shares of BC. Complaint, ¶ 7. Hancock Park Associates IV, L.L.C. ("HPA") is the general partner of Hancock Capital and manages Hancock Capital on behalf of the limited partners. Complaint, ¶ 4. Mike Fourticq, Sr., Mike Fourticq, Jr., and Kevin Listen ("Hancock directors") were officers of HPA and at the same time directors of the subsidiaries, and they comprised a majority on the board of directors of each of the subsidiaries. Complaint, ¶ 9.

AMI "manufactured and sold furniture to the hospitality and health care industries." Complaint, ¶ 12. BC "produced and sold furniture, primarily reclining chairs, for the consumer market. In 2008, [BC] closed its North Carolina facilities, subcontracted its domestic production to [AMI], and established its offices in [AMI] facilities in Martinsville, Virginia." Complaint, ¶ 13. The subsidiaries were financially insolvent, so a joint meeting of the boards of both subsidiaries was held on March 5, 2010. Complaint, ¶ 17.

At the joint meeting, Eric F. Plott, chief operations officer and chief financial officer of both subsidiaries, "recommended that HPA invest an additional 5.8 million dollars of Hancock Capital's assets into the [s]ubsidiaries to permit them to restructure their business models." Complaint, ¶ 19. After rejecting Plott's proposal, "HPA suggested that the [s]ubsidiaries

retain Accretive Solutions ("Accretive") to assist with exploring bankruptcy options." Subsequently, with funds provided by Hancock Capital, the subsidiaries retained Locke Lord as bankruptcy counsel upon Accretive's recommendation. Plott executed an engagement letter on or about March 15, 2010. Complaint, ¶¶ 21-24.

Locke Lord was aware "that the [s]ubsidiaries were fully owned by Hancock Capital," "that its investment in the [s]ubsidiaries was overseen by . . . HPA," and "that the [s]ubsidiaries . . . could not continue [to operate] without regular cash infusions from Hancock Capital." Complaint, ¶¶ 25-26.

On March 29, 2010, Locke Lord "made an in-depth presentation to HPA and its General Counsel, Rick Foker, about bankruptcy options for the [s] ubsidiaries, during which Locke Lord rendered legal advice concerning the options for restructuring. . . ." Among other things, Locke Lord advised HPA that "the manufacturing plant must be shut down by March 31, 2010," and that "the subsidiaries should file for bankruptcy as soon as possible. . . ." Complaint, ¶ 27. Locke Lord's advice was based on its understanding "that the objective of the bankruptcy filing was to protect the interests of Hancock Capital to the greatest extent possible by preserving the viability of the Barcolounger brand." Complaint, ¶ 28.

Initially, HPA rejected Locke Lord's request for a significant capital infusion, but, on March 25, 2010, Plott sent Mike Fourticq, Jr., an email stating "that the [s]ubsidiaries did not have sufficient cash to make the payroll at the end of March and that Hancock Capital must either recapitalize the businesses or provide Debtor in Possession funding so that a bankruptcy filing could proceed." Locke Lord partner David Wirt received a copy of the email and then transmitted the same to Foker with a note urging HPA to call an immediate joint board meeting. Complaint, ¶ 31.

Following Wirt's email, HPA "decided to divert over five million dollars of the proceeds from the pending sale of another Hancock Capital subsidiary to recapitalize the [s]ubsidiaries, and to provide an additional $100,000.00 immediately to enable the [s]ubsidiaries to meet the March 31 payroll." Complaint, ¶ 33.

Since "[t]he restructuring efforts required closure of the Martinsville, Virginia, plant," Locke Lord was "required to render appropriate legal advice regarding federal and state law that applied to such a plant closure." Locke Lord "knew, or should have known, that, under the WARN Act, Hancock Capital had potential liability as under a 'single employer' theory. . . ." Locke Lord knew that "HPA, acting for Hancock Capital, was exercising *de facto* control of the [s]ubsidiaries because the [s]ubsidiaries were broke, and that such *de facto* control created a grave risk of single employer liability" under federal law. Complaint, ¶¶ 35, 38-39.

Following a conference call between Plott and Locke Lord partners Wirt and Hansen concerning the "faltering company" exception to the sixty-day

notice requirement of the WARN Act, Plott sent a WARN notice to Hansen for his review. In his revisions to the notice, "Hansen neglected to mention the additional requirements for a notice given under the 'faltering business exception' despite the fact that the subject matter of the conference call that same day was the 'faltering business exception'." Complaint, ¶¶ 42, 45, 47.

On April 13, 2010, the subsidiaries held a joint board meeting, at which Foker and the Hancock directors were present. Locke Lord "again rendered legal advice regarding the restructuring of the [s]ubsidiaries," but "did not mention the obligation to either give a WARN Act notice, continue to operate the facility for sixty days and bear the attendant cost of operation, or to explore whether the requirements for a 'faltering company' or 'unforeseen business circumstance' could be met and give the appropriate notice for such circumstance." Locke Lord recommended preparing for a chapter 11 filing, and the board approved the recommendation. Complaint, ¶¶ 53-55, 60, 62.

On or about April 14, 2010, the "subsidiary sale that was to provide the funding for the recapitalization of the [s]ubsidiaries collapsed." There was no alternative at that point but for the subsidiaries immediately to cease operations. Complaint, ¶ 63. Plott adopted talking points concerning the plant closure based on Hansen's revisions; however, Hansen "did not advise that WARN Act notices be issued. . . ." As a result, when the plant closed on April 16, 2010, no WARN Act notices were issued. Complaint, ¶¶ 67, 69, 71.

After a former employee made a complaint to the United States Department of Labor, Locke Lord "recommended issuing the WARN Act notice as soon as possible." The resulting notice, which was issued on April 23, 2010, "was legally insufficient in that it did not meet the requirements" of federal law. Complaint, ¶¶ 72-74.

The subsidiaries filed bankruptcy petitions on May 19, 2010, and, at this point, HPA retained separate counsel. Complaint, ¶ 75. Shortly thereafter, former employees of the subsidiaries filed a class-action lawsuit, "alleging that Hancock Capital violated the WARN Act by failing to provide the employees with sixty days' written notice prior to the closure of the Facilities." The lawsuit, which was filed in the United States District Court for the Western District of Virginia, Danville Division, alleged that Hancock Capital and the subsidiaries were a "single employer" under the WARN Act. The plaintiffs alleged that Hancock Capital was not entitled to raise the defenses of "faltering company" or "unforeseen business circumstances" because the notice, which Locke Lord had reviewed, was legally insufficient. Complaint, ¶¶ 76-77.

Hancock Capital agreed to settle the case by paying the sum of $429,992.34, and it incurred attorneys' fees in the amount of $262,429.04. An order dismissing the lawsuit was entered on October 18, 2011. Complaint, ¶¶ 79-81.

At this stage of the proceedings, the issue is whether the plaintiff has stated a cause of action for legal malpractice, which, of course, requires the existence of an attorney-client relationship. *See Rutter v. Jones, Blechman, Woltz and Kelly,* 264 Va. 310, 568 S.E.2d 693 (2002). The defendant is correct in stating that "[t]he Complaint never alleges that Plaintiff retained Locke Lord as its counsel or that Locke Lord agreed to represent Plaintiff." Reply Memorandum in Support of Demurrer at 2. Moreover, the retention agreement does not expressly identify Hancock Capital as a client. However, "[f]ormality is not an essential element of the employment of an attorney. The contract may be express or implied, and it is sufficient that the advice and assistance of the attorney is sought and received, in matters pertinent to his profession." *Nicholson v. Shockley,* 192 Va. 270, 276-77, 64 S.E.2d 813 (1951). *See also Carstensen v. Chrisland Corp.,* 247 Va. 433, 447, 442 S.E.2d 660 (1994) ("some indication that the advice and assistance of the attorney was sought and received is integral to the creation of the attorney-client relationship").

Defendant argues that "[t]here are no allegations that Plaintiff ever sought any advice from Locke Lord about its own legal issues and no allegation that Locke Lord ever rendered such advice". Reply Memorandum in Support of Demurrer at 2. But this argument ignores the numerous allegations in the complaint to the effect that Locke Lord rendered advice to the subsidiaries concerning closing their plant *in the presence of Rick Foker, HPA's general counsel.* The complaint alleges that Foker was not on either subsidiary's board of directors, so his presence at these meetings strongly implies the existence of an attorney-client relationship between the plaintiff and the defendant. The defendant's argument also fails to acknowledge the allegations of the complaint concerning the failure to give a legally-sufficient notice under the WARN Act with the result that Hancock Capital had liability under the "single employer" theory, in view of its *de facto* control of the subsidiaries. If Hancock Capital and the subsidiaries were a "single employer" under federal law, as alleged, that fact also strongly implies the existence of an attorney-client relationship between the plaintiff and the defendant.

The retention agreement, which creates an express attorney-client relationship between the subsidiaries and the defendant, does not negate the existence of an implied attorney-client relationship between the plaintiff and the defendant. Nevertheless, the court agrees with the defendant that "Hancock Capital's alternative claim that it is a third-party beneficiary of the Engagement Agreement . . . fails as a matter of law." Demurrer, ¶ 10. "The essence of a third-party beneficiary claim is that others have agreed between themselves to bestow a benefit upon the third-party but one of the parties to the agreement fails to uphold his portion of the bargain." *Copenhaver v. Rogers,* 238 Va. 361, 367, 384 S.E.2d 593 (1989). The Supreme Court of Virginia has "recognized a specific limitation to the

third-party beneficiary doctrine in that 'the third party must show that the contracting parties clearly and definitely intended that the contract confer a benefit upon him'." *Environmental Staffing Corp. v. B & R Construction Management*, 283 Va. 787, 793, 725 S.E.2d 550 (2012), quoting *Collins v. First Union National Bank*, 272 Va. 744, 751, 636 S.E.2d 442, 446-47 (2006).

In the case at bar, there is no allegation in the complaint that, in entering into the retention agreement, the contracting parties intended to confer a direct benefit upon the plaintiff. *See MNC Credit Corp. v. Sickels*, 255 Va. 314, 497 S.E.2d 331 (1998) (holding that trial court properly sustained demurrer because MNC Credit failed to allege that attorneys executed contract with lending institution with intent of conferring direct benefit on MNC Credit).

The court, being of the opinion that the complaint states a cause of action for legal malpractice, overrules the demurrer in part and sustains the demurrer in part.